WEBSTER, DIRECTOR OF CENTRAL
INTELLIGENCE *v.* DOE

No. 86–1294.   Argued January 12, 1988—Decided June 15, 1988

REHNQUIST, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and in Parts I and II of which O'CONNOR, J., joined. O'CONNOR, J., filed an opinion concurring in part and dissenting in part, *post*, p. 605. SCALIA,

J., filed a dissenting opinion, *post*, p. 606. KENNEDY, J., took no part in the consideration or decision of the case.

*Solicitor General Fried* argued the cause for petitioner. With him on the briefs were *Assistant Attorney General Willard, Deputy Solicitor General Ayer, Paul J. Larkin, Jr., Barbara L. Herwig, Barbara C. Biddle, David P. Doherty,* and *R. Bruce Burke.*

*Mark H. Lynch* argued the cause for respondent. With him on the brief were *William H. Allen, Elliott Schulder, John A. Powell, Helen Hershkoff,* and *Steven R. Shapiro.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Section 102(c) of the National Security Act of 1947, 61 Stat. 498, as amended, provides that:

> "[T]he Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States . . . ." 50 U. S. C. § 403(c).

In this case we decide whether, and to what extent, the termination decisions of the Director under § 102(c) are judicially reviewable.

I

Respondent John Doe was first employed by the Central Intelligence Agency (CIA or Agency) in 1973 as a clerk-typist. He received periodic fitness reports that consistently rated him as an excellent or outstanding employee. By 1977, respondent had been promoted to a position as a covert electronics technician.

---

*\*Randall Glenn Wick, Susan D. McGreivy, Matthew Coles,* and *Mary C. Dunlap* filed a brief for the National Organization of Gay and Lesbian Scientists and Technical Professionals et al. as *amici curiae* urging affirmance.

*Jeffrey F. Liss, Laura A. Foggan,* and *Nan D. Hunter* filed a brief for the Employment Law Center et al. as *amici curiae.*

In January 1982, respondent voluntarily informed a CIA security officer that he was a homosexual. Almost immediately, the Agency placed respondent on paid administrative leave pending an investigation of his sexual orientation and conduct. On February 12 and again on February 17, respondent was extensively questioned by a polygraph officer concerning his homosexuality and possible security violations. Respondent denied having sexual relations with any foreign nationals and maintained that he had not disclosed classified information to any of his sexual partners. After these interviews, the officer told respondent that the polygraph tests indicated that he had truthfully answered all questions. The polygraph officer then prepared a five-page summary of his interviews with respondent, to which respondent was allowed to attach a two-page addendum.

On April 14, 1982, a CIA security agent informed respondent that the Agency's Office of Security had determined that respondent's homosexuality posed a threat to security, but declined to explain the nature of the danger. Respondent was then asked to resign. When he refused to do so, the Office of Security recommended to the CIA Director (petitioner's predecessor) that respondent be dismissed. After reviewing respondent's records and the evaluations of his subordinates, the Director "deemed it necessary and advisable in the interests of the United States to terminate [respondent's] employment with this Agency pursuant to section 102(c) of the National Security Act . . . ."[1] Respondent was also advised that, while the CIA would give him a positive recommendation in any future job search, if he applied for a job requiring a security clearance the Agency would inform the prospective employer that it had concluded that respondent's homosexuality presented a security threat.

Respondent then filed an action against petitioner in the United States District Court for the District of Columbia.

---

[1] See May 11, 1982, Letter from Deputy General Counsel of CIA to respondent's counsel, App. 37.

Respondent's amended complaint asserted a variety of statutory and constitutional claims against the Director.[2] Respondent alleged that the Director's decision to terminate his employment violated the Administrative Procedure Act (APA), 5 U. S. C. § 706, because it was arbitrary and capricious, represented an abuse of discretion, and was reached without observing the procedures required by law and CIA regulations.[3] He also complained that the Director's termination of his employment deprived him of constitutionally protected rights to property, liberty, and privacy in violation of the First, Fourth, Fifth, and Ninth Amendments. Finally, he asserted that his dismissal transgressed the procedural due process and equal protection of the laws guaranteed by the Fifth Amendment. Respondent requested a declaratory judgment that the Director had violated the APA and the Constitution, and asked the District Court for an injunction ordering petitioner to reinstate him to the position he held with the CIA prior to his dismissal. As an alternative remedy, he suggested that he be returned to paid administrative leave and that petitioner be ordered to reevaluate respondent's employment termination and provide a state-

---

[2] See Amended Complaint, id., at 5, 12–13.

[3] Title 5 U. S. C. § 706 provides in pertinent part:

"Scope of review

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

"(1) compel agency action unlawfully withheld or unreasonably delayed; and

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

"(B) contrary to constitutional right, power, privilege, or immunity;

"(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

"(D) without observance of procedure required by law."

ment of the reasons for any adverse final determination. Respondent sought no monetary damages in his amended complaint.

Petitioner moved to dismiss respondent's amended complaint on the ground that § 102(c) of the National Security Act (NSA) precludes judicial review of the Director's termination decisions under the provisions of the APA set forth in 5 U. S. C. §§ 701, 702, and 706 (1982 ed., Supp. IV). Section 702 provides judicial review to any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." The section further instructs that "[a]n action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." The scope of judicial review under § 702, however, is circumscribed by § 706, see n. 3, *supra*, and its availability at all is predicated on satisfying the requirements of § 701, which provides:

> "(a) This chapter applies, according to the provisions thereof, except to the extent that —
> "(1) statutes preclude judicial review; or
> "(2) agency action is committed to agency discretion by law."

The District Court denied petitioner's motion to dismiss, and granted respondent's motion for partial summary judgment. The court determined that the APA provided judicial review of petitioner's termination decisions made under § 102(c) of the NSA, and found that respondent had been unlawfully discharged because the CIA had not followed the procedures described in its own regulations. The District Court declined, however, to address respondent's constitutional claims. Respondent was ordered reinstated to admin-

istrative leave status, and the Agency was instructed to reconsider his case using procedures that would supply him with the reasons supporting any termination decision and provide him with an opportunity to respond.

A divided panel of the Court of Appeals for the District of Columbia Circuit vacated the District Court's judgment and remanded the case for further proceedings. The Court of Appeals first decided that judicial review under the APA of the Agency's decision to terminate respondent was not precluded by §§ 701(a)(1) or (a)(2). Turning to the merits, the Court of Appeals found that, while an agency must normally follow its own regulations, the CIA regulations cited by respondent do not limit the Director's discretion in making termination decisions. Moreover, the regulations themselves state that, with respect to terminations pursuant to § 102(c), the Director need not follow standard discharge procedures, but may direct that an employee "be separated immediately and without regard to any suggested procedural steps."[4] The majority thus concluded that the CIA regulations provide no independent source of procedural or substantive protection.

The Court of Appeals went on to hold that respondent must demonstrate that the Director's action was an arbitrary and capricious exercise of his power to discharge employees under § 102(c).[5] Because the record below was unclear on certain points critical to respondent's claim for relief, the Court of Appeals remanded the case to District Court for a determination of the reason for the Director's termination of respondent.[6] We granted certiorari to decide the question

---

[4] *Doe* v. *Casey*, 254 U. S. App. D. C. 282, 293, and n. 41, 796 F. 2d 1508, 1519, and n. 41 (1986) (citing CIA Regulation HR 20–27m).

[5] This "arbitrary and capricious" standard is derived from § 706(2)(A), see n. 3, *supra*.

[6] The dissenting judge argued that Congress intended to preclude such review in creating § 102(c), and that the decision to discharge an employee was committed by that section to Agency discretion. He concluded that

whether the Director's decision to discharge a CIA employee under § 102(c) of the NSA is judicially reviewable under the APA.

## II

The APA's comprehensive provisions, set forth in 5 U. S. C. §§ 701–706 (1982 ed. and Supp. IV), allow any person "adversely affected or aggrieved" by agency action to obtain judicial review thereof, so long as the decision challenged represents a "final agency action for which there is no other adequate remedy in a court." Typically, a litigant will contest an action (or failure to act) by an agency on the ground that the agency has neglected to follow the statutory directives of Congress. Section 701(a), however, limits application of the entire APA to situations in which judicial review is not precluded by statute, see § 701(a)(1), and the agency action is not committed to agency discretion by law, see § 701(a)(2).

In *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402 (1971), this Court explained the distinction between §§ 701(a)(1) and (a)(2). Subsection (a)(1) is concerned with whether Congress expressed an intent to prohibit judicial review; subsection (a)(2) applies "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" 401 U. S., at 410 (citing S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)).

We further explained what it means for an action to be "committed to agency discretion by law" in *Heckler* v. *Chaney*, 470 U. S. 821 (1985). *Heckler* required the Court to determine whether the Food and Drug Administration's decision not to undertake an enforcement proceeding against the use of certain drugs in administering the death penalty was subject to judicial review. We noted that, under § 701(a)(2), even when Congress has not affirmatively precluded judi-

---

neither the statutory nor constitutional claims arising from a § 102(c) discharge are judicially reviewable under the APA.

cial oversight, "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." 470 U. S., at 830. Since the statute conferring power on the Food and Drug Administration to prohibit the unlawful misbranding or misuse of drugs provided no substantive standards on which a court could base its review, we found that enforcement actions were committed to the complete discretion of the FDA to decide when and how they should be pursued.

Both *Overton Park* and *Heckler* emphasized that § 701 (a)(2) requires careful examination of the statute on which the claim of agency illegality is based (the Federal-Aid Highway Act of 1968 in *Overton Park* and the Federal Food, Drug, and Cosmetic Act in *Heckler*). In the present case, respondent's claims against the CIA arise from the Director's asserted violation of § 102(c) of the NSA. As an initial matter, it should be noted that § 102(c) allows termination of an Agency employee whenever the Director "shall *deem* such termination necessary or advisable in the interests of the United States" (emphasis added), not simply when the dismissal *is* necessary or advisable to those interests. This standard fairly exudes deference to the Director, and appears to us to foreclose the application of any meaningful judicial standard of review. Short of permitting cross-examination of the Director concerning his views of the Nation's security and whether the discharged employee was inimical to those interests, we see no basis on which a reviewing court could properly assess an Agency termination decision. The language of § 102(c) thus strongly suggests that its implementation was "committed to agency discretion by law."

So too does the overall structure of the NSA. Passed shortly after the close of the Second World War, the NSA created the CIA and gave its Director the responsibility "for protecting intelligence sources and methods from unauthorized disclosure." See 50 U. S. C. § 403(d)(3); S. Rep. No. 239, 80th Cong., 1st Sess., 2 (1947); H. R. Rep. No. 961,

80th Cong., 1st Sess., 3–4 (1947). Section 102(c) is an integral part of that statute, because the Agency's efficacy, and the Nation's security, depend in large measure on the reliability and trustworthiness of the Agency's employees. As we recognized in *Snepp* v. *United States*, 444 U. S. 507, 510 (1980), employment with the CIA entails a high degree of trust that is perhaps unmatched in Government service.

This overriding need for ensuring integrity in the Agency led us to uphold the Director's use of § 102(d)(3) of the NSA to withhold the identities of protected intelligence sources in *CIA* v. *Sims*, 471 U. S. 159 (1985). In denying respondent's Freedom of Information Act requests in *Sims* to produce certain CIA records, we stated that "[t]he plain meaning of the statutory language, as well as the legislative history of the National Security Act, . . . indicates that Congress vested in the Director of Central Intelligence very broad authority to protect all sources of intelligence information from disclosure." *Id.*, at 168–169. Section 102(c), that portion of the NSA under consideration in the present case, is part and parcel of the entire Act, and likewise exhibits the Act's extraordinary deference to the Director in his decision to terminate individual employees.

We thus find that the language and structure of § 102(c) indicate that Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA. We reverse the Court of Appeals to the extent that it found such terminations reviewable by the courts.

III

In addition to his claim that the Director failed to abide by the statutory dictates of § 102(c), respondent also alleged a number of constitutional violations in his amended complaint. Respondent charged that petitioner's termination of his employment deprived him of property and liberty interests under the Due Process Clause of the Fifth Amendment,

denied him equal protection of the laws, and unjustifiably burdened his right to privacy. Respondent asserts that he is entitled, under the APA, to judicial consideration of these claimed violations.[7]

We share the confusion of the Court of Appeals as to the precise nature of respondent's constitutional claims. It is difficult, if not impossible, to ascertain from the amended complaint whether respondent contends that his termination, based on *his* homosexuality, is constitutionally impermissible, or whether he asserts that a more pervasive discrimination policy exists in the CIA's employment practices regarding *all* homosexuals. This ambiguity in the amended complaint is no doubt attributable in part to the inconsistent explanations respondent received from the Agency itself regarding his termination. Prior to his discharge, respondent had been told by two CIA security officers that his homosexual activities themselves violated CIA regulations. In contrast, the Deputy General Counsel of the CIA later informed respondent that homosexuality was merely a security concern that did not inevitably result in termination, but instead was evaluated on a case-by-case basis.

---

[7] We understand that petitioner concedes that the Agency's failure to follow its *own regulations* can be challenged under the APA as a violation of § 102(c). See Reply Brief for Appellant in No. 85–5291 (CADC), p. 18 (*Doe* v. *Casey*, 254 U. S. App. D. C. 282, 796 F. 2d 1508 (1986)); see also *Service* v. *Dulles*, 354 U. S. 363 (1957) (recognizing the right of federal courts to review an agency's actions to ensure that its own regulations have been followed); *Sampson* v. *Murray*, 415 U. S. 61, 71 (1974) (stating that "federal courts do have authority to review the claim of a discharged governmental employee that the agency effectuating the discharge has not followed administrative regulations"). The Court of Appeals, however, found that the CIA's own regulations plainly protect the discretion granted the Director by § 102(c), and that the regulations "provid[e] no independent source of procedural or substantive protections." *Doe* v. *Casey, supra*, at 294, 796 F. 2d, at 1520. Thus, since petitioner prevailed on this ground below and does not seek further review of the question here, we do not reach that issue.

Petitioner maintains that, no matter what the nature of respondent's constitutional claims, judicial review is precluded by the language and intent of § 102(c). In petitioner's view, all Agency employment termination decisions, even those based on policies normally repugnant to the Constitution, are given over to the absolute discretion of the Director, and are hence unreviewable under the APA. We do not think § 102(c) may be read to exclude review of constitutional claims. We emphasized in *Johnson* v. *Robison*, 415 U. S. 361 (1974), that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. *Id.*, at 373–374. In *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), we reaffirmed that view. We require this heightened showing in part to avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim. See *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 681, n. 12 (1986).

Our review of § 102(c) convinces us that it cannot bear the preclusive weight petitioner would have it support. As detailed above, the section does commit employment termination decisions to the Director's discretion, and precludes challenges to these decisions based upon the statutory language of § 102(c). A discharged employee thus cannot complain that his termination was not "necessary or advisable in the interests of the United States," since that assessment is the Director's alone. Subsections (a)(1) and (a)(2) of § 701, however, remove from judicial review only those determinations specifically identified by Congress or "committed to agency discretion by law." Nothing in § 102(c) persuades us that Congress meant to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section; we believe that a constitutional claim based on an individual discharge may be reviewed by

the District Court.[8] We agree with the Court of Appeals that there must be further proceedings in the District Court on this issue.

Petitioner complains that judicial review even of constitutional claims will entail extensive "rummaging around" in the Agency's affairs to the detriment of national security. See Tr. of Oral Arg. 8–13. But petitioner acknowledges that Title VII claims attacking the hiring and promotion policies of the Agency are routinely entertained in federal court, see Reply Brief for Petitioner 13–14; Tr. of Oral Arg. 9, and the inquiry and discovery associated with those proceedings would seem to involve some of the same sort of rummaging. Furthermore, the District Court has the latitude to control any discovery process which may be instituted so as to balance respondent's need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission. See *Kerr* v. *United States District Court*, 426 U. S. 394, 405 (1976); *United States* v. *Reynolds*, 345 U. S. 1 (1953).

Petitioner also contends that even if respondent has raised a colorable constitutional claim arising out of his discharge, Congress in the interest of national security may deny the courts the authority to decide the claim and to order respondent's reinstatement if the claim is upheld. For the reasons previously stated, we do not think Congress meant to impose such restrictions when it enacted § 102(c) of the NSA. Even without such prohibitory legislation from Congress, of course, traditional equitable principles requiring the balancing of public and private interests control the grant of de-

---

[8] Petitioner asserts, see Brief for Petitioner 27–28, n. 23, that respondent fails to present a colorable constitutional claim when he asserts that there is a general CIA policy against employing homosexuals. Petitioner relies on our decision in *Bowers* v. *Hardwick*, 478 U. S. 186 (1986), to support this view. This question was not presented in the petition for certiorari, and we decline to consider it at this stage of the litigation.

claratory or injunctive relief in the federal courts. *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305 (1982); *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329–330 (1944). On remand, the District Court should thus address respondent's constitutional claims and the propriety of the equitable remedies sought.

The judgment of the Court of Appeals is affirmed in part, reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE O'CONNOR, concurring in part and dissenting in part.

I agree that the Administrative Procedure Act (APA) does not authorize judicial review of the employment decisions referred to in § 102(c) of the National Security Act of 1947. Because § 102(c) does not provide a meaningful standard for judicial review, such decisions are clearly "committed to agency discretion by law" within the meaning of the provision of the APA set forth in 5 U. S. C. § 701(a)(2). I do not understand the Court to say that the exception in § 701(a)(2) is necessarily or fully defined by reference to statutes "drawn in such broad terms that in a given case there is no law to apply." See *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 410 (1971), quoted *ante*, at 599. Accordingly, I join Parts I and II of the Court's opinion.

I disagree, however, with the Court's conclusion that a constitutional claim challenging the validity of an employment decision covered by § 102(c) may nonetheless be brought in a federal district court. Whatever may be the exact scope of Congress' power to close the lower federal courts to constitutional claims in other contexts, I have no doubt about its authority to do so here. The functions performed by the Central Intelligence Agency and the Director of Central Intelligence lie at the core of "the very delicate, plenary and

606

exclusive power of the President as the sole organ of the federal government in the field of international relations." *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936). The authority of the Director of Central Intelligence to control access to sensitive national security information by discharging employees deemed to be untrustworthy flows primarily from this constitutional power of the President, and Congress may surely provide that the inferior federal courts are not used to infringe on the President's constitutional authority. See, *e. g.*, *Department of Navy* v. *Egan*, 484 U. S. 518, 526–530 (1988); *Totten* v. *United States*, 92 U. S. 105 (1876). Section 102(c) plainly indicates that Congress has done exactly that, and the Court points to nothing in the structure, purpose, or legislative history of the National Security Act that would suggest a different conclusion. Accordingly, I respectfully dissent from the Court's decision to allow this lawsuit to go forward.

JUSTICE SCALIA, dissenting.

I agree with the Court's apparent holding in Part II of its opinion, *ante*, at 600 and 601, that the Director's decision to terminate a CIA employee is "committed to agency discretion by law" within the meaning of 5 U. S. C. §701(a)(2). But because I do not see how a decision can, either practically or legally, be both unreviewable and yet reviewable for constitutional defect, I regard Part III of the opinion as essentially undoing Part II. I therefore respectfully dissent from the judgment of the Court.

I

Before proceeding to address Part III of the Court's opinion, which I think to be in error, I must discuss one significant element of the analysis in Part II. Though I subscribe to most of that analysis, I disagree with the Court's description of what is required to come within subsection (a)(2) of §701, which provides that judicial review is unavailable "to the extent that . . . agency action is committed to agency dis-

cretion by law." *   The Court's discussion, *ante*, at 599–600, suggests that the Court of Appeals below was correct in holding that this provision is triggered only when there is "no law to apply."   See *Doe* v. *Casey*, 254 U. S. App. D. C. 282, 291–293, 796 F. 2d. 1508, 1517–1519 (1986).   But see *id.*, at 305–307, 796 F. 2d, at 1531–1533 (Buckley, J., dissenting).   Our precedents amply show that "commit[ment] to agency discretion by law" includes, but is not limited to, situations in which there is "no law to apply."

The Court relies for its "no law to apply" formulation upon our discussion in *Heckler* v. *Chaney*, 470 U. S. 821 (1985)—which, however, did not apply that as the sole criterion of § 701(a)(2)'s applicability, but to the contrary discussed the subject action's "general unsuitability" for review, and adverted to "tradition, case law, and sound reasoning."   470 U. S., at 831.   Moreover, the only supporting authority for the "no law to apply" test cited in *Chaney* was our observation in *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402 (1971), that "[t]he legislative history of the Administrative Procedure Act indicates that [§ 701(a)(2)] is applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'   S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)," *id.*, at 410.   Perhaps *Overton Park* discussed only the "no law to apply" factor because that was the only basis for non-

---

*Technically, this provision merely precludes judicial review under the judicial review provisions of the Administrative Procedure Act (APA), that is, under Chapter 7 of Title 5 of the United States Code.   However, at least with respect to all entities that come within the Chapter's definition of "agency," see 5 U. S. C. § 701(b), if review is not available under the APA it is not available at all.   Chapter 7 (originally enacted as § 10 of the APA) is an umbrella statute governing judicial review of all federal agency action.   While a right to judicial review of agency action may be created by a separate statutory or constitutional provision, once created it becomes subject to the judicial review provisions of the APA unless *specifically* excluded, see 5 U. S. C. § 559.   To my knowledge, no specific exclusion exists.

reviewability that was even arguably applicable. It surely could not have believed that factor to be exclusive, for that would contradict the very legislative history, both cited and quoted in the opinion, from which it had been derived, which read in full: "The basic exception of matters committed to agency discretion would apply even if not stated at the outset [of the judicial review Chapter]. If, *for example*, statutes are drawn in such broad terms that in a given case there is no law to apply, courts of course have no statutory question to review." S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945) (emphasis added).

The "no law to apply" test can account for the nonreviewability of certain issues, but falls far short of explaining the full scope of the areas from which the courts are excluded. For the fact is that there is no governmental decision that is not subject to a fair number of legal constraints precise enough to be susceptible of judicial application—beginning with the fundamental constraint that the decision must be taken in order to further a public purpose rather than a purely private interest; yet there are many governmental decisions that are not at all subject to judicial review. A United States Attorney's decision to prosecute, for example, will not be reviewed on the claim that it was prompted by personal animosity. Thus, "no law to apply" provides much less than the full answer to whether § 701(a)(2) applies.

The key to understanding the "committed to agency discretion *by law*" provision of § 701(a)(2) lies in contrasting it with the "*statutes* preclude judicial review" provision of § 701(a)(1). Why "statutes" for preclusion, but the much more general term "law" for commission to agency discretion? The answer is, as we implied in *Chaney*, that the latter was intended to refer to "the 'common law' of judicial review of agency action," 470 U. S., at 832—a body of jurisprudence that had marked out, with more or less precision, certain issues and certain areas that were beyond the range of judicial review. That jurisprudence included principles

ranging from the "political question" doctrine, to sovereign immunity (including doctrines determining when a suit against an officer would be deemed to be a suit against the sovereign), to official immunity, to prudential limitations upon the courts' equitable powers, to what can be described no more precisely than a traditional respect for the functions of the other branches reflected in the statement in *Marbury* v. *Madison,* 1 Cranch 137, 170–171 (1803), that "[w]here the head of a department acts in a case, in which executive discretion is to be exercised; in which he is the mere organ of executive will; it is again repeated, that any application to a court to control, in any respect, his conduct, would be rejected without hesitation." See, *e. g., Chicago & Southern Air Lines, Inc.* v. *Waterman S. S. Corp.,* 333 U. S. 103, 110–114 (1948); *Switchmen* v. *National Mediation Board,* 320 U. S. 297, 301–306 (1943); *United States* v. *George S. Bush & Co.,* 310 U. S. 371, 379–380 (1940); *Reaves* v. *Ainsworth,* 219 U. S. 296, 306 (1911); *Confiscation Cases,* 7 Wall. 454, 457–459 (1869); *Martin* v. *Mott,* 12 Wheat. 19, 29–30 (1827). Only if all that "common law" were embraced within § 701 (a)(2) could it have been true that, as was generally understood, "[t]he intended result of [§ 701(a)] is to restate the existing law as to the area of reviewable agency action." Attorney General's Manual on the Administrative Procedure Act 94 (1947). Because that is the meaning of the provision, we have continued to take into account for purposes of determining reviewability, post-APA as before, not only the text and structure of the statute under which the agency acts, but such factors as whether the decision involves "a sensitive and inherently discretionary judgment call," *Department of Navy* v. *Egan,* 484 U. S. 518, 527 (1988), whether it is the sort of decision that has traditionally been nonreviewable, *ICC* v. *Locomotive Engineers,* 482 U. S. 270, 282 (1987); *Chaney, supra,* at 832, and whether review would have "disruptive practical consequences," see *Southern R. Co.* v. *Seaboard Allied Milling Corp.,* 442 U. S. 444, 457 (1979). This ex-

plains the seeming contradiction between § 701(a)(2)'s disallowance of review to the extent that action is "committed to agency discretion," and § 706's injunction that a court shall set aside agency action that constitutes "an abuse of discretion." Since, in the former provision, "committed to agency discretion by law" means "of the sort that is traditionally unreviewable," it operates to keep certain categories of agency action out of the courts; but when agency action is appropriately in the courts, abuse of discretion is of course grounds for reversal.

All this law, shaped over the course of centuries and still developing in its application to new contexts, cannot possibly be contained within the phrase "no law to apply." It is not surprising, then, that although the Court recites the test it does not really apply it. Like other opinions relying upon it, this one essentially announces the test, declares victory and moves on. It is not really true "'that a court would have no meaningful standard against which to judge the agency's exercise of discretion,'" *ante*, at 600, quoting *Chaney*, 470 U. S., at 830. The standard set forth in § 102(c) of the National Security Act of 1947, 50 U. S. C. § 403(c), "necessary or advisable in the interests of the United States," at least excludes dismissal out of personal vindictiveness, or because the Director wants to give the job to his cousin. Why, on the Court's theory, is respondent not entitled to assert the presence of such excesses, under the "abuse of discretion" standard of § 706?

If and when this Court does come to consider the reviewability of a dismissal such as the present one on the ground that it violated the agency's regulations—a question the Court avoids today, see *ante*, at 602, n. 7—the difference between the "no law to apply" test and what I consider the correct test will be crucial. Perhaps a dismissal in violation of the regulations can be reviewed, but not simply because the regulations provide a standard that makes review possible. Thus, I agree with the Court's holding in Part II of its opin-

ion (though, as will soon appear, that holding seems to be undone by its holding in Part III), but on different reasoning.

## II

Before taking the reader through the terrain of the Court's holding that respondent may assert constitutional claims in this suit, I would like to try to clear some of the underbrush, consisting primarily of the Court's ominous warning that "[a] 'serious constitutional question' . . . would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Ante*, at 603, quoting from *Bowen* v. *Michigan Academy of Family Physicians*, 476 U. S. 667, 681, n. 12 (1986).

The first response to the Court's grave doubt about the constitutionality of denying all judicial review to a "colorable constitutional claim" is that the denial of all judicial review is not at issue here, but merely the denial of review in United States district courts. As to that, the law is, and has long been, clear. Article III, § 2, of the Constitution extends the judicial power to "all Cases . . . arising under this Constitution." But Article III, § 1, provides that the judicial power shall be vested "in one supreme Court, *and in such inferior Courts as the Congress may from time to time ordain and establish*" (emphasis added). We long ago held that the power not to create any lower federal courts at all includes the power to invest them with less than all of the judicial power.

> "The Constitution has defined the limits of the judicial power of the United States, but has not prescribed how much of it shall be exercised by the Circuit Court; consequently, the statute which does prescribe the limits of their jurisdiction, cannot be in conflict with the Constitution, unless it confers powers not enumerated therein." *Sheldon* v. *Sill*, 8 How. 441, 449 (1850).

Thus, if there is any truth to the proposition that judicial cognizance of constitutional claims cannot be eliminated, it

is, at most, that they cannot be eliminated from state courts, and from this Court's appellate jurisdiction over cases from state courts (or cases from federal courts, should there be any) involving such claims. Narrowly viewed, therefore, there is no shadow of a constitutional doubt that we are free to hold that the present suit, whether based on constitutional grounds or not, will not lie.

It can fairly be argued, however, that our interpretation of § 701(a)(2) indirectly implicates the constitutional question whether state courts can be deprived of jurisdiction, because if they cannot, then interpreting § 701(a)(2) to exclude relief here would impute to Congress the peculiar intent to let state courts review Federal Government action that it is unwilling to let federal district courts review—or, alternatively, the peculiar intent to let federal district courts review, upon removal from state courts pursuant to 28 U. S. C. § 1442(a)(1), claims that it is unwilling to let federal district courts review in original actions. I turn, then, to the substance of the Court's warning that judicial review of all "colorable constitutional claims" arising out of the respondent's dismissal may well be constitutionally required. What could possibly be the basis for this fear? Surely not some general principle that *all* constitutional violations must be remediable in the courts. The very text of the Constitution refutes that principle, since it provides that "[e]ach House shall be the Judge of the Elections, Returns and Qualifications of its own Members," Art. I, § 5, and that "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place," Art. I, § 6. Claims concerning constitutional violations committed in these contexts—for example, the rather grave constitutional claim that an election has been stolen—cannot be addressed to the courts. See, *e. g.*, *Morgan* v. *United States*, 255 U. S. App. D. C. 231, 801 F. 2d 445 (1986). Even apart from the strict text of the Constitution, we have found some constitutional claims to be beyond judicial review because they involve

"political questions." See, *e. g.*, *Coleman* v. *Miller*, 307 U. S. 433, 443–446 (1939); *Ohio ex rel. Bryant* v. *Akron Metropolitan Park District*, 281 U. S. 74, 79–80 (1930). The doctrine of sovereign immunity—not repealed by the Constitution, but to the contrary at least partly reaffirmed as to the States by the Eleventh Amendment—is a monument to the principle that some constitutional claims can go unheard. No one would suggest that, if Congress had not passed the Tucker Act, 28 U. S. C. § 1491(a)(1), the courts would be able to order disbursements from the Treasury to pay for property taken under lawful authority (and subsequently destroyed) without just compensation. See *Schillinger* v. *United States*, 155 U. S. 163, 166–169 (1894). And finally, the doctrine of equitable discretion, which permits a court to refuse relief, even where no relief at law is available, when that would unduly impair the public interest, does not stand aside simply because the basis for the relief is a constitutional claim. In sum, it is simply untenable that there must be a judicial remedy for every constitutional violation. Members of Congress and the supervising officers of the Executive Branch take the same oath to uphold the Constitution that we do, and sometimes they are left to perform that oath unreviewed, as we always are.

Perhaps, then, the Court means to appeal to a more limited principle, that although there may be areas where judicial review of a constitutional claim will be denied, the scope of those areas is fixed by the Constitution and judicial tradition, and cannot be affected by *Congress*, through the enactment of a statute such as § 102(c). That would be a rather counterintuitive principle, especially since Congress has in reality been the principal determiner of the scope of review, for constitutional claims as well as all other claims, through its waiver of the pre-existing doctrine of sovereign immunity. On the merits of the point, however: It seems to me clear that courts would not entertain, for example, an action for backpay by a dismissed Secretary of State claiming that the

reason he lost his Government job was that the President did not like his religious views — surely a colorable violation of the First Amendment. I am confident we would hold that the President's choice of his Secretary of State is a "political question." But what about a similar suit by the Deputy Secretary of State? Or one of the Under Secretaries? Or an Assistant Secretary? Or the head of the European Desk? Is there really a constitutional line that falls at some immutable point between one and another of these offices at which the principle of unreviewability cuts in, and which cannot be altered by congressional prescription? I think not. I think Congress can prescribe, at least within broad limits, that for certain jobs the dismissal decision will be unreviewable — that is, will be "committed to agency discretion by law."

Once it is acknowledged, as I think it must be, (1) that not all constitutional claims require a judicial remedy, and (2) that the identification of those that do not can, even if only within narrow limits, be determined by Congress, then it is clear that the "serious constitutional question" feared by the Court is an illusion. Indeed, it seems to me that if one is in a mood to worry about serious constitutional questions the one to worry about is not whether Congress can, by enacting § 102(c), give the President, through his Director of Central Intelligence, unreviewable discretion in firing the agents that he employs to gather military and foreign affairs intelligence, but rather whether Congress could constitutionally *permit* the courts to review all such decisions if it wanted to. We have acknowledged that the courts cannot intervene when there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker* v. *Carr*, 369 U. S. 186, 217 (1962). We have recognized "the insistence (evident from the number of Clauses devoted to the subject) with which the Constitution confers authority over the Army, Navy, and militia upon the political branches." *United States* v. *Stanley*, 483 U. S. 669, 682 (1987). We have also recognized "the very delicate, plenary

and exclusive power of the President as the sole organ of the federal government in the field of international relations—a power which does not require as a basis for its exercise an act of Congress." *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304, 320 (1936). And finally, we have acknowledged that "[i]t is impossible for a government wisely to make critical decisions about foreign policy and national defense without the benefit of dependable foreign intelligence." *Snepp* v. *United States*, 444 U. S. 507, 512, n. 7 (1980) *(per curiam)*. We have thus recognized that the "authority to classify and control access to information bearing on national security and to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President *and exists quite apart from any explicit congressional grant.*" *Department of Navy* v. *Egan*, 484 U. S., at 527 (emphasis added).

I think it entirely beyond doubt that if Congress intended, by the APA in 5 U. S. C. § 701(a)(2), to exclude judicial review of the President's decision (through the Director of Central Intelligence) to dismiss an officer of the Central Intelligence Agency, that disposition would be constitutionally permissible.

## III

I turn, then, to whether that executive action is, within the meaning of § 701(a)(2), "committed to agency discretion by law." My discussion of this point can be brief, because the answer is compellingly obvious. Section 102(c) of the National Security Act of 1947, 61 Stat. 498, states:

> "*Notwithstanding . . . the provisions of any other law,* the Director of Central Intelligence, *may, in his discretion,* terminate the employment of any officer or employee of the Agency *whenever he shall deem* such termination necessary or advisable in the interests of the

United States . . . ." 50 U. S. C. § 403(c) (emphasis added).

Further, as the Court declares, § 102(c) is an "integral part" of the National Security Act, which throughout exhibits "extraordinary deference to the Director." *Ante,* at 601. Given this statutory text, and given (as discussed above) that the area to which the text pertains is one of predominant executive authority and of traditional judicial abstention, it is difficult to conceive of a statutory scheme that more clearly reflects that "commit[ment] to agency discretion by law" to which § 701(a)(2) refers.

It is baffling to observe that the Court seems to agree with the foregoing assessment, holding that "the language and structure of § 102(c) indicate that Congress meant to commit individual employee discharges to the Director's discretion." *Ibid.* Nevertheless, without explanation the Court reaches the conclusion that "a constitutional claim based on an individual discharge may be reviewed by the District Court." *Ante,* at 603–604. It seems to me the Court is attempting the impossible feat of having its cake and eating it too. The opinion states that "[a] discharged employee . . . cannot complain that his termination was not 'necessary or advisable in the interests of the United States,' *since that assessment is the Director's alone.*" *Ante,* at 603 (emphasis added). But two sentences later it says that "[n]othing in § 102(c) persuades us that Congress meant to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section." Which are we to believe? If the former, the case should be at an end. If the § 102(c) assessment is really "the Director's alone," the only conceivable basis for review of respondent's dismissal (which is what this case is about) would be that the dismissal was not *really* the result of a § 102(c) assessment by the Director. But respondent has never contended that, nor could he. Not only was his counsel formally advised, by letter of May 11, 1982, that "the Director has deemed it necessary and

advisable in the interests of the United States to terminate your client's employment with this Agency pursuant to section 102(c)," App. 37, but the petitioner filed with the court an affidavit by the Director, dated September 17, 1982, stating that "[a]fter careful consideration of the matter, I determined that the termination of Mr. Doe's employment was necessary and advisable in the interests of the United States and, exercising my discretion under the authority granted by section 102(c) . . . I terminated Mr. Doe's employment." *Id.*, at 56. Even if the basis for the Director's assessment was the respondent's homosexuality, and even if the connection between that and the interests of the United States is an irrational and hence an unconstitutional one, if that assessment is really "the Director's alone" there is nothing more to litigate about. I cannot imagine what the Court expects the "further proceedings in the District Court" which it commands, *ante*, at 604, to consist of, unless perhaps an academic seminar on the relationship of homosexuality to security risk. For even were the District Court persuaded that no such relationship exists, "that assessment is the Director's alone."

Since the Court's disposition contradicts its fair assurances, I must assume that the § 102(c) judgment is no longer "the Director's alone," but rather only "the Director's alone except to the extent it is colorably claimed that his judgment is unconstitutional." I turn, then, to the question of where this exception comes from. As discussed at length earlier, the Constitution assuredly does not require it. Nor does the text of the statute. True, it only gives the Director absolute discretion to dismiss "[n]otwithstanding . . . the provisions of any other *law*" (emphasis added). But one would hardly have expected it to say "[n]otwithstanding the provisions of any other law *or of the Constitution.*" What the provision directly addresses is the authority to dismiss, not the authority of the courts to review the dismissal. And the Director does *not* have the authority to dismiss in violation of the Constitution, nor could Congress give it to him. The implication

of nonreviewability in this text, its manifestation that the ac-- tion is meant to be "committed to agency discretion," is no weaker with regard to constitutional claims than nonconstitutional claims, unless one accepts the unacceptable proposition that the only basis for such committal is "no law to apply."

Perhaps, then, a constitutional right is by its nature so much more important to the claimant than a statutory right that a statute which plainly excludes the latter should not be read to exclude the former unless it says so. That principle has never been announced—and with good reason, because its premise is not true. An individual's contention that the Government has reneged upon a $100,000 debt owing under a contract is much more important to him—both financially and, I suspect, in the sense of injustice that he feels—than the same individual's claim that a particular federal licensing provision requiring a $100 license denies him equal protection of the laws, or that a particular state tax violates the Commerce Clause. A citizen would much rather have his statutory entitlement correctly acknowledged after a constitutionally inadequate hearing, than have it incorrectly denied after a proceeding that fulfills all the requirements of the Due Process Clause. The *only* respect in which a constitutional claim is necessarily more significant than any other kind of claim is that, regardless of how trivial its real-life importance may be in the case at hand, it can be asserted against the action of the legislature itself, whereas a nonconstitutional claim (no matter how significant) cannot. That is an important distinction, and one relevant to the constitutional analysis that I conducted above. But it has no relevance to the question whether, as between executive violations of statute and executive violations of the Constitution—both of which are equally unlawful, and neither of which can be said, *a priori*, to be more harmful or more unfair to the plaintiff— one or the other category should be favored by a presumption against exclusion of judicial review.

Even if we were to assume, however, contrary to all reason, that every constitutional claim is *ipso facto* more worthy, and every statutory claim less worthy, of judicial review, there would be no basis for writing that preference into a statute that makes no distinction between the two. We have rejected such judicial rewriting of legislation even in the more appealing situation where particular applications of a statute are not merely less desirable but in fact raise "grave constitutional doubts." That, we have said, only permits us to adopt one rather than another permissible reading of the statute, but not, by altering its terms, "to ignore the legislative will in order to avoid constitutional adjudication." *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S. 833, 841 (1986). There is no more textual basis for reading this statute as barring only nonconstitutional claims than there is to read it as barring only claims with a monetary worth of less than $1 million. Neither of the two decisions cited by the Court to sustain its power to read in a limitation for constitutional claims remotely supports that proposition. In *Johnson* v. *Robison*, 415 U. S. 361 (1974), we considered a statute precluding judicial review of "'the *decisions* of the Administrator on any question of law or fact *under* any law administered by the Veterans' Administration.'" *Id.*, at 367 (quoting 38 U. S. C. § 211(a)). We concluded that this statute did not bar judicial review of a challenge to the constitutionality of the statute itself, since that was a challenge not to a decision of the Administrator but to a decision of Congress. Our holding was based upon the text, and not upon some judicial power to read in a "constitutional claims" exception. And in *Weinberger* v. *Salfi*, 422 U. S. 749 (1975), we held that 42 U. S. C. § 405(h), a statute depriving district courts of federal-question jurisdiction over "any claim arising under" Title II of the Social Security Act, *did* embrace even constitutional challenges, since its language was "quite different" from that at issue in *Johnson*, and "extend[ed] to any 'action' seeking 'to recover on any [Social Security] claim'—

irrespective of whether resort to judicial processes is necessitated by . . . allegedly unconstitutional statutory restrictions." 422 U. S., at 762. In *Salfi*, to be sure, another statutory provision was available that would enable judicial review of the constitutional claim, but as just observed, that distinction does not justify drawing a line that has no basis in the statute. *Commodity Futures Trading Comm'n v. Schor, supra.*

The Court seeks to downplay the harm produced by today's decision by observing that "petitioner acknowledges that Title VII claims attacking the hiring and promotion policies of the Agency are routinely entertained in federal court." *Ante*, at 604, citing Reply Brief for Petitioner 13–14; Tr. of Oral Arg. 9. Assuming that those suits are statutorily authorized, I am willing to accept the Director's assertion that, while suits regarding hiring or promotion are tolerable, a suit regarding dismissal is not. Like the Court, I have no basis of knowledge on which I could deny that—especially since it is obvious that if the Director thinks that a particular hiring or promotion suit is genuinely contrary to the interests of the United States he can simply make the hiring or grant the promotion, and then dismiss the prospective litigant under § 102(c).

The harm done by today's decision is that, contrary to what Congress knows is preferable, it brings a significant decision-making process of our intelligence services into a forum where it does not belong. Neither the Constitution, nor our laws, nor common sense gives an individual a right to come into court to litigate the reasons for his dismissal as an intelligence agent. It is of course not just *valid* constitutional claims that today's decision makes the basis for judicial review of the Director's action, but all *colorable* constitutional claims, whether meritorious or not. And in determining whether what is colorable is in fact meritorious, a court will necessarily have to review the entire decision. If the Director denies, for example, respondent's contention in the pres-

ent case that he was dismissed because he was a homosexual, how can a court possibly resolve the dispute without knowing what other good, intelligence-related reasons there might have been? I do not see how any "latitude to control any discovery process," *ante*, at 604, could justify the refusal to permit such an inquiry, at least *in camera*. Presumably the court would be expected to evaluate whether the agent really did fail in this or that secret mission. The documents needed will make interesting reading for district judges (and perhaps others) throughout the country. Of course the Agency can seek to protect itself, ultimately, by an authorized assertion of executive privilege, *United States* v. *Nixon*, 418 U. S. 683 (1974), but that is a power to be invoked only *in extremis*, and any scheme of judicial review of which it is a central feature is extreme. I would, in any event, not like to be the agent who has to explain to the intelligence services of other nations, with which we sometimes cooperate, that they need have no worry that the secret information they give us will be subjected to the notoriously broad discovery powers of our courts, because, although we have to litigate the dismissal of our spies, we have available a protection of somewhat uncertain scope known as executive privilege, which the President can invoke if he is willing to take the political damage that it often entails.

Today's result, however, will have ramifications far beyond creation of the world's only secret intelligence agency that must litigate the dismissal of its agents. If constitutional claims can be raised in this highly sensitive context, it is hard to imagine where they cannot. The assumption that there are any executive decisions that cannot be hauled into the courts may no longer be valid. Also obsolete may be the assumption that we are capable of preserving a sensible common law of judicial review.

I respectfully dissent.