798 F.Supp. 557 (1992)
Richard WILKINS and Roland Smotherman, Plaintiffs,
v.
Secretary of the Interior Manuel LUJAN, in his official capacity; Superintendent of the Ozark National Scenic Riverways, Art Sullivan, in his official capacity as National Park Superintendent; Randy Clark, an individual; Defendants.
No. S91-31C(5).
United States District Court, E.D. Missouri, Southeastern Division.
June 17, 1992.
*558 Douglas Kennedy, Poplar Bluff, Mo., for plaintiffs.
Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for defendants.

*559 MEMORANDUM AND OPINION
LIMBAUGH, District Judge.
Approximately twenty wild horses roam freely in small bands on the land of the Ozark National Scenic Riverways. The Secretary of the Interior and the National Park Service plan to remove the wild horses. The Court previously granted plaintiffs' motion for temporary restraining order to halt the removal of the horses. The Plaintiffs also filed a complaint for permanent injunctive relief and this case was tried before this Court sitting without a jury on June 14, 1991. Defendants seek dissolution of the temporary restraining order and denial of plaintiff's motion for a permanent injunction. This Court, having now considered the pleadings, the testimony of the witnesses, the deposition testimony, the documents in evidence, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

I. FINDINGS OF FACT
The Ozark National Scenic Riverways (the "Riverways") are located in southeast Missouri, and are managed and administered by the National Park Service (the "Park Service"). The Park Service is part of the Department of Interior.
Defendants Manuel Lujan and Arthur Sullivan are duly appointed officers, agents and employees of the United States government within the Department of the Interior. In particular, Manuel Lujan is the Secretary of Interior, and Arthur Sullivan is the Park Service executive serving as the superintendent of the Riverways. Defendant Randy Clark is a Missouri resident who was awarded a government contract to remove the wild horses from the Riverways.
Plaintiffs Richard Wilkins and Roland Smotherman are citizens of Missouri who reside in the vicinity of the Riverways.
Plaintiffs instituted this civil action for the purpose of enjoining the defendants from removing certain wild or feral (not domesticated) horses from the Riverways.
Congress authorized the Ozark Riverways in 1964. 16 U.S.C. § 460m et seq. The Riverways park is a 140-mile-long narrow strip of land along the banks of the Current River and the Jacks Fork River in Missouri. The Enabling Act for the Riverways states that its purpose is for "... conserving and interpreting unique, scenic and other natural values and objects of historic interest...." Of the lands falling within the Riverways, about 51,500 acres are federally owned, 14,000 acres are state owned and 6,400 acres are privately owned. Between one and two million people visit the Ozark Riverways annually. Almost sixty percent of the visitors float some portion of the rivers.
One or two bands of feral horses roam along a 24-mile stretch of the Ozark Riverways. The horses usually remain near the water, but sometimes roam five or more miles away. The horses roam in two separate herds of about 10 horses. The total number of horses over the years has remained at about 20. The horses appear in good health, showing shiny coats, adequate weight and well-defined muscles. The existence of the wild horses and their exploits are frequent topics of conversation and a source of lore for the residents. Sightings of the wild horses are rare and considered extraordinary and delightful. Many people come to the area in hope of spotting the horses. Some take a horseback trail ride for that purpose.
The Park Service considers the horses an "exotic species" rather than a "native species." Under Park Service management policies,
[e]xotic species are those that occur in a given place as a result of direct or indirect, deliberate or accidental actions by humans (not including deliberate reintroductions) ... The exotic species introduced because of such human action would not have evolved with the species native to the place in question and, therefore, would not be a natural component of the ecological system characteristic of that place.
Horses that were natives of the continental United States died out on this continent *560 about 8,000 B.C. Spanish explorers introduced domestic horses onto this continent in the sixteenth or seventeenth century. The origin of the wild horses at the Ozark Riverways is unknown. Residents of the Ozark Riverways area believe they are descendants of horses that were released or escaped in the 1940s or 1950s before "open range" ended in Missouri.
The policy of the Department of the Interior is to remove exotic animals from United States land. Arthur Sullivan, superintendent of the Riverways, testified that the guidelines for operating the Park Service and the Riverways mandate removal of the horses. To support the decision to remove the horses, the Park Service conducted a study in 1985. Later, in April 1989, two investigators from the Humane Society reported abuse of the horses and sought their removal.
In May of 1990, the Park Service gave public notice of the plan to remove the horses and requested public comment and proposals on how to best remove the horses. The announcement generated controversy and opposition by local residents. In response, the Humane Society changed its position and it now opposes removal of the horses.
A second study, which concluded in February 1991, was conducted and found no significant impact by the decision to remove the horses. Both studies recommend that the horses be rounded up and put up for adoption.
Ultimately, defendants elected to issue a special-use permit to defendant Randy Clark to remove the horses. Mr. Clark proposed to trap the horses and then place them for adoption to individual owners. Mr. Clark began his attempts to capture the horses. Plaintiffs filed this lawsuit, the Court entered the temporary restraining order and Mr. Clark ceased his attempts to corral the horses. Plaintiffs requested a special use permit to manage and care for the horses, but defendants denied the permit.

II. CONCLUSIONS OF LAW

A. Jurisdiction and Venue

This Court has jurisdiction pursuant to 28 U.S.C. 1331 as this action arises under laws of the United States. Venue is proper in the Southeastern Division of the Eastern District of the United States District Court, as this is where plaintiffs reside. 28 U.S.C. § 1402.

B. Standing

As a threshold matter, the Court must determine whether plaintiffs have standing to bring this action. Article III of the U.S. Constitution requires a plaintiff to show that he has suffered some actual or threatened injury as a result of the defendant's allegedly illegal conduct, that the injury is fairly traceable to the challenged action, and that he is likely to obtain redress by a favorable decision. Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). In addition the plaintiff must satisfy the "prudential" requirement, that is asserted interests "fall within the `zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Valley Forge, 454 U.S. at 475, 102 S.Ct. at 760 (quoting Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)).
Plaintiff Richard Wilkins is a resident of Birch Tree, Missouri. He lives about eight miles from the Riverways and visits the park frequently. By occupation, he operates a feed store. Plaintiff Roland Smotherman also is a lifelong resident of Birch Tree, Missouri. He shoes and trains horses for a living. Both plaintiffs are members of the Wild Horses League, which was formed in November 1990. The League is a loose association of about 13 people interested in seeing the horses remain in the Riverways park. Both plaintiffs have sighted the wild horses on occasions and have heard tales of them all of their lives. Plaintiffs allege that the defendants' removal of the horses will harm them as they use the Riverways.
*561 For plaintiffs to assert standing, their injury in fact need not be economic in nature. United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 686, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973). "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society." Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 1366, 31 L.Ed.2d 636 (1972). The threatened injury is the deprivation of plaintiffs' opportunity to view the wild horses and the disappearance of part of the history and culture of their community. The threatened injury is directly traceable to the defendants' actions and it is reasonably clear that plaintiffs' injury could be remedied by judicial review of the administrative action. Finally, the Enabling Act for the Ozark Riverways states its purpose is to conserve and interpret unique, scenic and other natural values and objects of historic interest, therefore plaintiffs' interest falls within the relevant "zone of interests" of the statute. The Court concludes that plaintiffs do have standing to bring this action in their individual capacities.

C. Reviewability

The next question is whether plaintiffs are entitled to any judicial review. The Administrative Procedure Act ("APA") provides that
[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency, action within the meaning of a relevant state, is entitled to judicial review thereof.... Nothing herein affects limitations on judicial review.
5 U.S.C. § 702. Section 701 of the APA provides that the action of "each authority of the Government of the United States", which includes the Secretary of the Interior, is subject to judicial review except where there is a statutory prohibition on review or where "agency action is committed to agency discretion by law." In this case, there is no indication that Congress meant to prohibit judicial review.
The APA exception for action "committed to agency discretion" is very narrow. The legislative history of the APA indicates that it is applicable in those rare instances where "statutes are drawn in such broad terms that in a given case there is no law to apply." Webster v. Doe, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971) (citing S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). "[R]eview is not to be had if the Statute is drawn so that a court would have no meaningful standard against which to judge an agency's exercise of discretion." Webster, 486 U.S. at 600, 108 S.Ct. at 2052 quoting Heckler v. Chaney, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).
When Congress created the Riverways, it explicitly provided that the creation of the Riverways was
for the purpose of conserving and interpreting scenic and other natural values and objects of historic interest, including preservation of portions of the Current River and Jacks Fork River in Missouri as free-flowing streams, preservation of springs and caves, management of wild-life, and provisions for use and enjoyment of the outdoor recreation resources thereof by the people of the United States ...
16 U.S.C. § 460m. Congress further provided the Secretary of the Interior and Park Service with the authority to administer the Riverways and manage its natural resources in accordance with the statutes governing management of all national parks, 16 U.S.C. §§ 1-5.
The Act creating the Park Service provides that its purpose "is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. The Act governing the Park Service specifically provides that the Secretary "may also provide in his discretion for the destruction of such animals *562 and of such plant life as may be detrimental to the use of any said parks, monuments or reservations." 16 U.S.C. § 3 (emphasis added).
The enabling act and the statutes governing management of national parks provide "law to apply" and thus the exemption for action "committed to agency discretion" is inapplicable.

D. Standard of Review

The APA establishes the proper standard for review. Section 706(2)(A) of the APA permits the Court to hold unlawful and set aside agency action, findings and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

E. Analysis

The Court must first consider whether the defendants acted within the scope of their authority in deciding to remove the horses from the Riverways. Overton Park, 401 U.S. at 415-16, 91 S.Ct. at 823-24.
The Secretary has authority to protect the lands entrusted by Congress to the Department of the Interior. Free Enterprise Canoe Renters Ass'n. v. Watt, 711 F.2d 852 (8th Cir.1983). If the horses were detrimental to the Riverways, the Secretary would have the authority to destroy them. See 16 U.S.C. § 3. Arguably, at least, this authority also could include the authority to remove the horses.
The Court must next decide, however, whether the decision to remove the horses was based on consideration of relevant facts and whether there has been a clear error of judgment. Overton Park, 401 U.S. at 416, 91 S.Ct. at 823.
As previously noted, the purpose of the Park Service "is to conserve the scenery and the natural and historic objects and the wild life therein ... by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. Congress granted the Secretary authority to destroy animals and plant life "as may be detrimental to the use of any said parks, monuments or reservations." 16 U.S.C. § 3. Congress established the Riverways "for the purpose of conserving and interpreting scenic and other natural values and objects of historic interest, ... including ... management of wildlife...." 16 U.S.C. § 460m. The management policies of the Department of the Interior distinguish native, or naturally occurring, species from "exotic species." The feral horses are technically "exotic," because they were originally introduced by man and are not indigenous wildlife. The policies provide for protection of native animals and state that only native species will be allowed in "natural zones," which includes the area in which the horses roam. The policies also provide for management, including destruction or removal, of exotic species "already present" in certain circumstances.
Management of Exotic Species Already Present. Management of populations of exotic plant and animal species, up to and including eradication, will be undertaken wherever such species threaten park resources or public health and when control is prudent and feasible. Examples of threatening situations include
posing a public health hazard as determined by the Centers for Disease Control or a hazard to public safety disrupting the accurate presentation of a historic scene
damaging historic or archeological resources
interfering with natural processes and the perpetuation of natural features or native species (especially those that are endangered, threatened, or otherwise unique)
significantly hampering the management of park or adjacent lands
High priority will be given to the management of exotic species that have a substantial impact on park resources and that can reasonably be expected to be successfully controlled....
Management Policies, U.S. Department of the Interior, NPS, 1988.
Mr. Sullivan testified, by deposition, the Enabling Statute for the Riverways was *563 interpreted in light of the two basic missions of the Park Service: preservation of cultural and natural resources and making those resources available to the public for outdoor recreational use.
Mr. Sullivan stated that he does not regard the horses as a cultural resource nor does he consider them part of the "unique scenery" of the Riverways. In his opinion, the horses should be removed because they are "exotic" species and because "they do not fit into the natural scheme of things." He believed that because the horses were feral animals, the Park Service had no alternative but to remove them. Other factors that were considered were that the horses had damaged about six acres of crops, that they compete for certain foods with the native wildlife, that they are a potential safety hazard to park visitors and that they could be potential carriers of disease.
David Erickson, assistant chief in the division of wildlife for the Missouri Department of Conservation, testified at trial on behalf of defendants. Mr. Erickson spent a day in the "impact area" to observe the damage done by the horses. Mr. Erickson testified that the damage done by the wild horses was "surprising." The horses left hoof tracks where they walked and also ate vegetation. The horses eat cane, which places them in competition with the warbler, a bird that also inhabits the area.
The Court considers the allegations of damage caused by the horses to be exaggerated.
The Court concludes that the Secretary made a clear error in judgment by the determination that the horses must be removed. First, the Secretary would have the authority to destroy the horses if they were detrimental to the park. See 16 U.S.C. § 3. The Secretary argues that this authority also permits removal of the horses. Nonetheless, the evidence simply does not show that the horses are detrimental to the use of the Riverways park or that they are any threat to park resources. See 16 U.S.C. § 3. This is a band of, at most, 20 horses in a park of nearly 70,000 acres, or one horse to 3,500 acres. Damage to six acres of crops and the other minor problems from the horses certainly is not detrimental to the use of the Riverways park. In fact, there was testimony that the damage caused by the attempted removal was actually greater than the damage the horses themselves caused to the vegetation. The horses, which are rarely even sighted, shy away from people and do not pose any threat to visitors in the park.
Second, the Park Service management policies anticipate management of exotic species, up to and including eradication, wherever such species threaten park resources or public health. The fact that the policies limit when management  including removal  will be undertaken necessarily means that unless that standard is met the Park Service will not interfere with a species that is of no threat to the park. Again, the evidence simply does not show that the horses are of any threat to the park resources or public health. The horses certainly have not significantly hampered the management of the park or of adjacent lands nor do they fall within any of the examples of threatening situations set out in the management policies. Thus, under the Park Service policies, removal is improper.
Further, the Secretary failed to consider relevant facts as to whether the horses are a cultural or historical resource.
At the time he made the decision to remove the horses, Mr. Sullivan was aware that Congress enacted the Wild Free-Roaming Horses and Burros Act of 1971, 16 U.S.C. § 1331-1340, to protect wild horses and burros as "living symbols of the historic and pioneer spirit of the West." The Act declares wild horses and burros to be "an integral part of the natural system of the public lands," 16 U.S.C. § 1331, and mandates that the animals be managed "as components of the public lands." Id. at 1333(a). The Act directs the Secretary to protect and manage the wild horses and burros "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." Id. Mr. Sullivan determined, however, that the Act applies only to lands administered by *564 the U.S. Forest Service and the Bureau of Land Management. Because the Park Service manages the Ozark Riverways, the Wild Free-Roaming Horses and Burros Act did not apply to it, he concluded. The Act, nonetheless, certainly demonstrates Congressional intent to protect wild horses.
Additionally, the views of local residents on the horses as a cultural resource apparently were disregarded. No one questions that the horses ran wild before the creation of the park. Numerous lifelong residents of the area testified that they consider the horses an important part of the local scenery and culture. They enjoy the thrill of sighting the horses running wild on what was once the open range.
In September 1990, U.S. Representative Bill Emerson wrote Mr. Sullivan and informed him that he had been contacted by more than 1,000 individuals in response to the Park Service's proposal to remove the wild horses and stating the "tremendous opposition to the removal of the horses." Representative Emerson also wrote that the horses had adapted extremely well to the environment and suggested that provisions should be made to allow the horses to continue to roam the area, with re-evaluation if they, in fact, become a detriment. Mr. Sullivan said he recalled the letter, but was not sure if it was included in the 1991 report.
Representative Emerson wrote a follow-up letter in February 6, 1991 to Mr. Lujan. He wrote that letter to contradict two justifications that the Park Service offered for the removal of the horses. One reason was that Missouri law mandated removal of the horses. A letter from the Missouri Attorney General's Office eliminated that reason. A second justification was that the horses were not native species. Rep. Emerson pointed out that horses were probably present in the area at the time it was settled and that rainbow trout, brown trout and various carp present in the Riverways were not native species.[1]
Further, contrary to Park Service representations of poor health of the horses in a press release announcing its intention to remove the horses, its own 1985 study stated that the horses appear in good health, showing shiny coats, adequate weight and well-defined muscles. Local residents who have seen the horses agree that they are in good health.
Based on the foregoing, the Court concludes that the decision to remove the horses constituted a clear error in judgment as to whether governing statutes and management policies required removal of the horses and the decision failed to consider relevant facts, in particular, the damage caused by removal of the horses and whether the horses are cultural or historical objects. The facts simply did not show that the horses are a detriment or a threat to the park. Their removal is inconsistent with the purpose of the Park Service, that is, to conserve the scenery and the natural and historic objects and the wild life in the parks as to leave them unimpaired for the enjoyment of future generations. 16 U.S.C. § 1.
Because the Court concludes that the Secretary made an error in judgment and failed to consider relevant facts, it is unnecessary to consider whether the administrator followed the necessary procedural requirements. Overton Park, 401 U.S. at 417, 91 S.Ct. at 824.[2]
For the foregoing reasons, judgment is entered in favor of plaintiffs and against defendants in this cause of action.
NOTES
[1] The Park Service responded that allowing the horses to roam at the Riverways is contrary to the purpose of the park. The Park Service stated that the horses compete for forage with several species of wildlife, "including valued park wildlife" and that they had damaged five to six acres of vegetation.
[2] The Court does note, however, Mr. Sullivan testified that he did not think it was necessary to hold a public hearing on the decision to remove the horses because there was no other option than to remove the horses.