John DOE and Jane Doe, Plaintiffs,

v.

George J. TENET, Individually and as Director of Central Intelligence and Director of the Central Intelligence Agency, and The United States of America, Defendants.

No. C99–1597L.

United States District Court,
W.D. Washington,
at Seattle.

June 7, 2000.

Steven W Hale, Elizabeth A Alaniz, Perkins Coie, Seattle, WA, for John Doe, Jane Doe, plaintiffs.

Harold Malkin, U.S. Attorney's Office, Seattle, WA, for United States of America, defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

LASNIK, District Judge.

Plaintiffs, former Cold War spies who were resettled in the United States with the assistance of the Central Intelligence Agency ("CIA"), have sued the CIA for ceasing to pay an allegedly agreed-upon financial stipend to plaintiffs and for the CIA's treatment of plaintiffs' administrative appeal of the CIA's denial of that stipend. Plaintiffs allege violations of their procedural and substantive due process rights under the United States Constitution, and also seek declaratory, injunctive, and mandamus relief requiring the CIA to resume payments to plaintiffs.

This matter comes before the Court on defendants' Motion To Dismiss and plaintiffs' Motion For Preliminary Injunction. The Court has considered the briefs and supporting papers submitted by the parties, and heard oral argument on April 25, 2000. For the reasons discussed below, the Motion To Dismiss is granted in part and denied in part and the Motion For Preliminary Injunction is denied. ·

### I. FACTUAL BACKGROUND[1]

Plaintiffs John and Jane Doe were formerly citizens of a foreign country that, at

---

1. For purposes of ruling on defendants' Rule 12(b)(6) motion to dismiss for failure to state

the time, was considered an adversary of the United States.[2] Plaintiffs were well educated professionals in their country of origin, and Mr. Doe was a high-ranking diplomat with that country's foreign service. For a period during the Cold War, Mr. Doe served in a senior diplomatic post in his country's embassy in another foreign country.

While working in that position, Mr. Doe and his wife approached a person they knew to be affiliated with the United States embassy and requested assistance in defecting to the United States. Plaintiffs allege that CIA agents then sequestered them in a CIA "safe house" for approximately twelve hours, attempting to coerce them and intimidate them into remaining at their diplomatic post and conducting espionage for the United States. The agents allegedly told plaintiffs they could not survive in the United States without the CIA's assistance, and that if they agreed to conduct espionage for a certain period of time, the CIA would arrange for plaintiffs' travel to and resettlement in the United States and would ensure financial and personal security for the remainder of plaintiffs' lives. The agents allegedly told plaintiffs that this program of assistance was approved at the highest levels of the United States government, and was in fact required to be provided under the laws of the United States.

Plaintiffs claim to have initially resisted the CIA agents' requests that they conduct espionage, protesting that they merely wished to defect. The agents, however, persisted. During the twelve hours they spent with the agents, plaintiffs claim the agents made several phone calls to CIA headquarters for instructions and approval of the offers being made to plaintiffs. Finally, in reliance on the CIA's alleged promise that plaintiffs eventually would be resettled in the United States, plaintiffs agreed to assist the United States by remaining at their diplomatic post and conducting espionage.

Plaintiffs allege they carried out their end of this bargain by conducting espionage on behalf of the United States for the specified time period. At the end of that period, agents allegedly pressured plaintiffs to engage in additional, more dangerous, activities. Plaintiffs, feeling they had no choice, complied with the new requests and assisted the CIA for an additional period of time.

Finally, the United States government arranged for plaintiffs to be brought to the United States. The plaintiffs spent approximately eight months in a safe house upon their arrival in the United States, where they were debriefed by various persons they understood to be CIA or other government officials. The United States provided plaintiffs with false identities and backgrounds, and offered to place plaintiffs in a semi-retired status with financial and health benefits. Plaintiffs requested that they instead be permitted to integrate into American society and become gainfully employed members of their new community. The CIA agreed, and promised that plaintiffs would be supported for the remainder of their lives to the extent their own earnings were insufficient. CIA agents explained that the CIA was required by law to provide plaintiffs with a "safety net" for the duration of their lives.[3]

a claim, the Court assumes the truthfulness of plaintiffs' factual allegations. Accordingly, the facts described herein are those facts alleged by plaintiffs in the Second Amended Complaint and other pleadings. The Court did not assume these facts to be true in ruling on that part of defendants' motion to dismiss addressing the issue of jurisdiction. See discussion infra.

2. The parties have excluded certain names and details in order to protect both the safety of plaintiffs and what the United States may consider to be national security information.

3. Plaintiffs were told this was required as a result of their "PL–110" status, a term plaintiffs understood to refer to a United States statute or regulation governing persons in their situation. Defendants claim in their brief not to know what "Pl–110" refers to, but

During their first eight months in the United States, the CIA provided plaintiffs with education, medical benefits and a modest monetary living stipend. The educational benefits were intended to form the basis of plaintiffs' new false identities. Plaintiffs were subsequently resettled in the Seattle area, where they initially received a stipend of $20,000 per year in addition to housing, health care and other benefits. Over time, that stipend increased to $27,000. Beginning in 1987, Mr. Doe obtained professional employment with the assistance of the CIA, which provided Mr. Doe with a false resume and references. As his salary increased, the amount of the stipend provided by the CIA was decreased accordingly.[4] During the latter several years in which plaintiffs received a stipend, the total of the stipend and Mr. and Mrs. Doe's salaries equaled $27,000.

In 1989, Mr. Doe and the CIA agreed that if Mr. Doe's salary increased to $27,-000, the CIA would cease paying him his stipend. Mr. Doe claims he specifically asked for assurances that if his employment were terminated, the CIA would resume paying the stipend. CIA officials allegedly assured Mr. Doe that payment of the stipend would be resumed in such circumstances, and assured Mr. Doe that the CIA would always "be there" for plaintiffs and that the CIA would help him find a new job if he were terminated.

In February 1997, the bank for which Mr. Doe worked was involved in a corporate merger. Mr. Doe's position was eliminated and he was laid off. While Mr. Doe made an effort to find new work, he had advanced in age by this time, his limited training was in a field in which corporate downsizing was occurring throughout the country, and he was restricted in his job search by the CIA's security arrangement, which required him to continue using the false background and false identity he had been given. Even though he was required to use the false resume and background the CIA had provided him, the CIA refused to assist him as it had in the past with finding a new job. Since that time, Mr. Doe has been unable to find a job.

Plaintiffs are now in serious financial straits. Both plaintiffs suffer from health problems, and have incurred substantial health care expenses. For a period of time, plaintiffs traveled to Eastern Europe to live with relatives in order to take advantage of more affordable health care and a lower cost of living. However, when Mr. Doe was recognized by an individual he knew to be a former member of his native country's security police, plaintiffs feared for their safety and returned to Seattle.

Plaintiffs now allege that if defendants do not resume payment of their monetary stipend, they may again be forced to return to Eastern Europe to live with relatives in order to survive financially. Plaintiffs fear that such a move will put them at great risk should they be recognized or found by agents of their native country's security police.

## II. PROCEDURAL BACKGROUND

When Mr. Doe lost the job the CIA had helped him obtain, he and his wife contacted the CIA in the required manner.

believe it is a reference to 50 U.S.C. § 403h, which imposes no obligation of assistance on the government. Plaintiffs believe classified regulations implementing 50 U.S.C. § 403h may exist. It is clear that the term "PL–110" has been used by members of the intelligence community. The Court notes that plaintiffs' counsel saw a reference to testimony regarding "PL–110" in one of the CIA's decision documents they were permitted to review. Furthermore, testimony before Congress re-

garding defectors suggests that "PL–110" is a term used in the intelligence community. *See, e.g., Federal Government's Handling of Soviet and Communist Bloc Defectors: Hearings Before the Perm. Subcomm. On Investigations of the Senate Comm. On Gov. Affairs,* 100th Cong. 102 (1987) (testimony of William W. Geimer, President, Jamestown Foundation); *see also, id.* at 191 (staff statement).

4. Mrs. Doe also worked on a part-time basis; her earnings were apparently minimal.

Plaintiffs wrote to their contact, providing the details of their situation and requesting assistance. Four months later, they received a letter from a CIA official. That letter stated that while the CIA "sympathize[d] with the situation" plaintiffs found themselves in, "due to budget constraints" the agency was unable to provide any additional assistance. The letter also stated that the CIA continued to be "concerned for [plaintiffs'] security and welfare and would hope to be flexible should [plaintiffs] require assistance in the future." Doe Decl. ¶ 15, Exh. 5.

Plaintiffs made further unsuccessful attempts to obtain assistance from the agency, and finally sought legal representation. The CIA granted plaintiffs' counsel security clearances for purposes of representing plaintiffs in their claim with the CIA. During an August 1997 meeting at which plaintiffs' attorneys were granted security clearance, an attorney from the CIA's general counsel's office explained that the CIA had retrospectively made a subjective assessment of the espionage activities performed by plaintiffs for the United States, and had determined that plaintiffs had already received "adequate" compensation for their services. When plaintiffs' counsel posed questions to the CIA attorney, she replied that she had no further information, and that she was simply a "messenger" with no knowledge of the substantive facts of plaintiffs' case. Plaintiffs' counsel asked to speak with someone with substantive knowledge or decision making authority, but were refused. Plaintiffs' counsel were told plaintiffs could appeal the decision to the Director of Central Intelligence ("DCI").

Plaintiffs' counsel prepared an appeal to the DCI. In doing so, they requested a variety of documents from the CIA. For example, counsel requested copies of the regulations governing the appeal process and the rules and regulations applicable to resettled aliens such as plaintiffs. The CIA never responded to these requests.

Plaintiffs' counsel requested access to relevant records, persons with relevant knowledge of facts, and persons responsible for the appeal process. All of these requests were either denied or ignored by the CIA.

Notwithstanding their complete lack of substantive or procedural guidelines, plaintiffs' counsel filed their appeal with the DCI in December 1997. Counsel for the CIA advised plaintiffs' counsel orally that the Deputy Director of Operations (not the DCI) had denied the appeal, and advised plaintiffs' counsel that they could appeal to a panel chaired by former DCI Richard Helms ("the Helms Panel"). Plaintiffs' counsel again requested copies of relevant regulations or rules governing such an appeal, and requested written confirmation that their previous appeal had been denied. The CIA ignored both requests.

Plaintiffs appealed to the Helms Panel, again requesting information on the relevant rules and procedures, the opportunity to appear before the panel to present their case, and the opportunity to confront witnesses. These requests were all either denied or ignored.

Plaintiffs' counsel later were advised orally that based upon the recommendation of the Helms Panel, the DCI had determined that the CIA should provide plaintiffs with benefits for a period of one year, contingent on plaintiffs' signing a waiver and release of claims. Plaintiffs' counsel were permitted to review the DCI's written decision in a secure location in Washington, D.C., although the decision document did not bear any classification. Plaintiffs' counsel were not permitted to receive a copy of the document. The written decision did not state the reasons for rejecting plaintiffs' legal arguments and factual assertions, or what evidence had been relied upon in reaching the decision.

Plaintiffs' counsel also was allowed to review a document that appeared to be minutes of the Helms Panel's proceeding. That document indicated that three persons involved in the recruitment, handling,

and resettlement of plaintiffs had testified. The brief summary of their testimony indicated that one witness testified that he or she had explained to plaintiffs that their "PL–110" status represented a life-long commitment for personal and financial security.

Plaintiffs' counsel sought clarification of whether the appeal process and the DCI's decision represented a final adjudication of plaintiffs' rights, and if so, how such an adjudication could be premised on a demand for a waiver and release. The CIA did not respond to plaintiffs' counsel's inquiry.

This action ensued following plaintiffs' counsel's inability to obtain clarification or information from the CIA regarding the nature and scope of the agency's decision with respect to plaintiffs' appeal, or the legal, evidentiary, regulatory, or statutory basis for that decision. In their Second Amended Complaint, plaintiffs have stated claims for violation of their due process rights under the United States Constitution, and for declaratory, injunctive, and mandamus relief requiring the CIA to resume payment of the monetary stipend at issue.

## III. DISCUSSION

Defendants have moved, pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss the Second Amended Complaint.[5] First, defendants argue that this Court lacks subject matter jurisdiction over plaintiffs' claims. Second, defendants argue that the Amended Complaint fails to state claims upon which relief may be granted.

### A. *Motion To Dismiss For Lack Of Subject Matter Jurisdiction*

 In moving for dismissal on the basis of jurisdiction, defendants make three arguments. First, defendants argue that this Court is precluded under the Supreme Court's decision in *Totten v. United States,* 92 U.S. 105, 2 Otto 105, 23 L.Ed. 605 (1875) from enforcing "secret agreements." Second, defendants argue that litigation of plaintiffs' claim would involve issues "that are, and must, remain as secret as the existence and substance of any secret agreements themselves." Defs,' Opp. at 5. Third, defendants argue that this Court lacks jurisdiction as a result of the Tucker Act, 28 U.S.C. ¶ 1491(a)(1), which provides that only the United States Court of Claims may exercise jurisdiction over contract claims against the government seeking more than $10,000.

First, the Court disagrees with defendants' characterization of this case throughout its pleadings as a "dispute over an alleged contract for secret services." Defs.' Opp. at 5. The plaintiffs have alleged, in relevant part, that defendants' actions violated plaintiffs' due process rights. The Court need not consider whether plaintiffs actually had an enforceable contract with defendants entitling them to the benefits they seek. Nor must the Court, as defendants suggest, make any "explicit or implicit acknowledgment" that such a contract exists.

Regardless of whether a secret contract does exist, there are substantial issues and claims remaining in this case that lie outside the reach of *Totten.* In particular, as described more fully below, plaintiffs have alleged conduct on the part of defendants that, if true, would constitute a violation of plaintiffs' substantive due process rights. In addition, regardless of whether plaintiffs had a contractual entitlement to benefits (which *Totten* might foreclose the Court from recognizing) or a right to benefits arising out of promissory estoppel, equitable estoppel, or a statutory or regulatory right, once the defendants represented to plaintiffs that a process existed through which they could "appeal" the denial of their monetary stipend, defendants as-

---

5. The parties stipulated to allow filing of a Second Amended Complaint, in which plain-

tiffs do not assert, but reserve the right to assert, a contract claim against defendants.

sumed an obligation to provide procedural due process to plaintiffs. The allegations here plainly state such constitutional claims, which are not automatically shielded from this Court's review by *Totten*.[6]

In fact, the Supreme Court has held that the denial of "any judicial forum for a colorable constitutional claim" would raise "serious constitutional questions." *Webster v. Doe*, 486 U.S. 592, 603–05, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (*quoting Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 681, n. 12, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986)). While the Court was referring to the government's argument that section 102(c) of the National Security Act precluded judicial review of a constitutional claim against the CIA, the Court also noted that "[e]ven without such prohibitory legislation from Congress, ... traditional equitable principles requiring the balancing of public and private interests control the grant of declaratory and injunctive relief in the federal courts." *Webster*, 486 U.S. at 604–05, 108 S.Ct. 2047. Here, those "traditional equitable principles" require this Court to exercise jurisdiction over plaintiffs' constitutional claims where those claims raise factual questions outside the scope of a *Totten*-type contract dispute.

Second, litigation of plaintiffs' claims will not require public revelation of the defendants' intelligence gathering methods. As the Supreme Court observed in *Webster*, "the District Court has the latitude to control any discovery process which may be instituted so as to balance [plaintiffs'] need for access to proof which would support a colorable constitutional claim against the extraordinary needs of the CIA for confidentiality and the protection of its methods, sources, and mission." *Id.* at 604, 108 S.Ct. 2047.

Certainly that portion of plaintiffs' case that is premised on the CIA's procedures for reviewing complaints and appeals does not represent a national security secret. Moreover, with respect to the facts of plaintiffs' case, Defendants have reviewed and approved for public filing all papers filed by plaintiffs thus far. If the CIA does not object to public airing of the allegations already filed in this case, the Court is confident that the case may be litigated without requiring the disclosure of national security secrets. If not, defendants may request leave to submit materials in this matter under seal or *in camera*, or may assert the state secrets privilege recognized in *United States v. Reynolds*, 345 U.S. 1, 7–8, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

Finally, defendants' argument that the Tucker Act requires that this case be heard by the United States Court of Claims fails for the same reason its *Totten* argument fails. Plaintiffs are not seeking a money judgment from defendants based on a contract. Plaintiffs are seeking to have this Court determine whether their due process rights were violated, and to have this Court enter an injunctive remedy which could, as a consequence, require defendants to reconsider plaintiffs' request to have their payments resumed. This does not make this case a contract dispute that must be submitted to the United States Court of Claims.

Accordingly, the Court finds that it has subject matter jurisdiction over plaintiffs' due process claims.

### B. *Motion To Dismiss For Failure To State A Claim*

Defendant also has moved to dismiss plaintiffs' action pursuant to Rule 12(b)(6)

---

**6.** Accordingly, *Guong v. United States*, 860 F.2d 1063 (Fed.Cir.1988), which defendants rely upon, is not directly on point. Unlike the plaintiffs in this case, Guong had no constitutional claims; rather, he sued to recover for breach of an alleged employment contract with the CIA—a purely contractual claim. In

holding that Guong's claim was an unenforceable contract for "secret services" under *Totten*, the Federal Circuit did not address the issue of whether *Totten* would foreclose the courts' consideration of constitutional claims such as those at issue here.

for failing to state claims upon which relief can be granted. The Court will only grant such a motion where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also, Terracom v. Valley Nat'l Bank,* 49 F.3d 555, 558 (9th Cir. 1995). In considering such a motion, the Court assumes the allegations of fact contained in the complaint to be true and construes them in the light most favorable to the non-moving party. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey,* 920 F.2d 1496, 1507 (9th Cir.1990).

### 1. Due Process Claims

Plaintiffs' due process claim appears to the Court to be, in fact, two claims. In alleging that defendants' actions deprived plaintiffs of constitutionally protected property and liberty interests, plaintiffs have stated both substantive and procedural due process claims. Accordingly, the Court must examine whether plaintiffs have alleged a violation of procedural due process, which depends on whether the government has followed proper procedures in depriving plaintiffs of property or liberty interests, and substantive due process, which depends on whether the government's deprivation of plaintiffs' fundamental interests is permissible regardless of the fairness of the procedures used.

#### a. *Procedural Due Process*

■ The doctrine of procedural due process requires that the government give a person certain procedural rights before depriving that person of a constitutionally protected property or liberty interest. *See, e.g., Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). It is beyond dispute that under

the facts as alleged in this case, plaintiffs were afforded very little process. Indeed, the CIA declined even to respond to requests for the relevant rules or regulations governing the agency's appeal process The only question the Court must decide in determining whether plaintiffs have stated a procedural due process claim is whether plaintiffs were deprived of a constitutionally protected property or liberty interest.

Defendants argue that plaintiffs cannot show that they were deprived of a protected property interest, because "[t]o have a property interest in a benefit, a person must have a legitimate claim of entitlement to it." Def.s' Opp. at 7 (citing *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Defendants argue that an entitlement, which may be created by rules, statutes, regulations, ordinances, or express or implied contracts, does not exist in this case because the contract upon which plaintiffs base their entitlement is a secret agreement, which the Court is precluded from even acknowledging the existence of under *Totten.*

The Court disagrees. Plaintiffs may be able to base their entitlement to receipt of the CIA's monetary stipend on theories other than contract. For example, if plaintiffs are able to prove that they had an entitlement to benefits based on a promissory or equitable estoppel theory, or if there is a regulatory or statutory basis for their entitlement,[7] then they may be able to show a constitutionally protected property interest, regardless of *Totten.*

In addition to a possible property interest in the benefits they received up until 1997, plaintiffs have alleged a deprivation of their most fundamental liberty interests, including their ability to provide for their basic needs and their personal safety. After plaintiffs assisted defendants by con-

---

**7.** The Court notes, for example, that defendants have not disclosed any relevant regulations to plaintiffs or the Court, and that there appears to be some dispute as to whether a regulatory or statutory scheme referred to as "PL–110" entitles plaintiffs to life-long bene-

fits. *See* discussion *supra* at note 3. Without full briefing and consideration of these issues, the Court is not prepared to find that plaintiffs have no regulatory or statutory basis for their entitlement.

ducting espionage activities, plaintiffs were required to assume new identities in order to resettle in the United States and to protect their safety. This required sacrificing their past professional training, personal relationships, names, and personal histories. With the defendants' assistance, plaintiffs were obliged to establish false identities in order to "engage in the common occupations of life." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

Now that defendants have ceased payment of a monetary stipend to plaintiffs, and allegedly have refused to assist Mr. Doe in finding new employment, plaintiffs' abilities to engage in the "common occupations of life," which are "essential to the orderly pursuit of happiness by free men," are substantially hindered *Id.* As the Court recognized in *Meyer*, these activities and occupations are encompassed by the Constitution's liberty protection. *Id.*

Furthermore, now that plaintiffs' economic situation may require them to move abroad in order to find a way to support themselves financially, their personal safety is put at risk as well. Plaintiffs believe the espionage activities they performed are well-known to their former government, and that if they return to Eastern Europe, they may be recognized and retaliated against by agents of their former government. This directly implicates plaintiffs' fundamental liberty interests. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1062 (6th Cir.1998) (individuals' "interest in preserving their lives ..., as well as preserving their personal security and bodily integrity" constitutes a "fundamental liberty interest").

Assuming, as the Court must at this stage, that the facts alleged by plaintiffs are true, the Court finds that plaintiffs have alleged facts sufficient to state a claim that their right to procedural due process has been violated.

### b. *Substantive Due Process*

■ Plaintiffs also have alleged conduct supporting a claim that the CIA's conduct has violated their substantive due process rights. Substantive due process violations occur when the state impermissibly deprives an individual of an interest so fundamental, deprivation is prohibited "regardless of the fairness of the procedures used ..." *Wood v. Ostrander*, 879 F.2d 583, 589 (9th Cir.1989) (*quoting Daniels v. Williams*, 474 U.S. 327, 330–32, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). As it applies here, the Due Process Clause prevents the government from affirmatively placing an individual in danger, and requires the government to provide for and protect a person with whom it creates a special relationship. *Wang v. Reno*, 81 F.3d 808, 818 (9th Cir.1996).[8]

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court held that when the government creates a special relationship with a person, the substantive component of the Due Process Clause obligates the government to provide for that person's basic needs and to protect him from deprivations of liberty. *Id.; see also, Wang*, 81 F.3d at 818; *L.W. v. Grubbs*, 974 F.2d 119, 121 (9th Cir.1992).[9] Similar cases have held that the government may not affirmatively place an individual in danger. *See, e.g., Wood v. Ostrander*, 879 F.2d at 589–90; *Ketchum v. County of Alameda*, 811 F.2d 1243, 1247 (9th Cir. 1987).

---

**8.** The analysis of these two protections has been blended together in some cases, and they have been described as exceptions to the general rule that "members of the public have no constitutional right to sue state employees who fail to protect them from harm inflicted by third parties." *L.W. v. Grubbs*, 974 F.2d at 121.

**9.** While many "special relationship" cases have involved individuals being held in custody, such custody is not required to find that a special relationship has been created. *See, e.g., Wang*, 81 F.3d at 818 (involving government's prosecution witness).

■ Here, the complaint alleges both that the government created a special relationship with the plaintiffs and that it has affirmatively put them in danger. Plaintiffs allege that the government created a special relationship with plaintiffs by relying on them to conduct espionage, bringing them to this country and resettling them under false identities, aiding them in obtaining employment through the use of false backgrounds, and paying them a monetary stipend over the course of the years. Furthermore, plaintiffs allege that the government has failed to provide them with the ability to sustain their most basic needs since it ceased paying their monetary stipend.

Plaintiffs also allege that the government has affirmatively put them in danger. Not only is the government alleged to have placed plaintiffs in danger by asking them to engage in dangerous espionage activities, the government's cessation of plaintiffs' monetary stipend allegedly leaves them with no means of sustaining their basic needs, forcing them to travel to Eastern Europe in search of economic security, where their personal safety would be in danger.

The Court finds that plaintiffs have sufficiently stated a claim that the government violated their substantive due process rights by creating a special relationship with plaintiffs and then failing to provide for their basic needs and protect them from deprivations of liberty, or by affirmatively placing them in danger. Accordingly, the Court will deny the motion to dismiss as to that claim.

## 2. Equal Protection Claim

■ Plaintiffs also claim that defendants have violated their right to equal protection by treating them differently from those corporations or persons with whom the government has ongoing relationships or contracts, on the basis that their contract was to provide "secret services." Plaintiffs allege that by invoking the *Totten* doctrine, the government sub-

jects defectors and others who secretly contract with the government to unequal treatment in violation of the Fifth Amendment.

The Court finds that, as to this claim, plaintiffs have failed to state a claim upon which relief can be granted. Equal Protection requires that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Thus, plaintiffs must allege "unequal treatment of people similarly situated." *Gilbrook v. City of Westminster*, 177 F.3d 839, 871 (9th Cir.1999).

It is clear that ordinary government contractors and "secret" government contractors are not "similarly situated." The government undoubtedly has a valid interest in making secret contracts that must be treated differently from ordinary government contracts. Furthermore, as defendants have noted in their Motion To Dismiss, plaintiffs have not alleged that the CIA's treatment of their claim to a monetary stipend was unequal to treatment of claims submitted by others. Therefore, the Court finds that plaintiffs have not alleged facts that, if proven, would support their claim under the Equal Protection clause of the Fifth Amendment. That claim will, therefore, be dismissed.

## 3. Injunctive, Declaratory Judgment, and Mandamus Claims

■ Defendants have not argued that plaintiffs' claims for injunctive, declaratory, and mandamus relief should be dismissed, except insofar as they argue that these claims are merely cleverly worded contract-based claims precluded from judicial enforcement by *Totten*. As set forth above, there is more at stake in this case than contract rights. Accordingly, the Court finds that plaintiffs have stated claims for an injunction, a declaratory judgment, and mandamus that are sufficient to withstand this Motion To Dismiss.

### C. *Motion For Preliminary Injunction*

 Plaintiffs have filed a motion for preliminary injunction, seeking to enjoin defendants from denying payment of the monetary stipend to plaintiffs. Where a party seeks an injunction compelling another party to commence performance of some mandatory act, as opposed to prohibiting some conduct, courts are required to be "extremely cautious," as such mandatory injunctions are "particularly disfavored." *Stanley v. University of Southern California*, 13 F.3d 1313, 1319–20 (9th Cir. 1994). In the case of a motion for a mandatory injunction, Ninth Circuit law provides that district courts should "deny such relief unless the facts and law clearly favor the moving party." *Id.* at 1320.

Plaintiffs argue that they do not seek a mandatory injunction, but rather seek to preserve the status quo, defining the status quo as the period prior to defendants' wrongful cessation of payments to plaintiffs. However, the motion does not seek to prohibit conduct by defendants; rather, it seeks to require defendants to perform an affirmative act they are not currently performing. Therefore, the Court finds that plaintiffs do seek a mandatory injunction, which is subject to the heightened standard discussed above. Under that standard, the Court is not satisfied that the facts and law "clearly favor" the plaintiffs and the motion for preliminary injunction will be denied.

### IV. CONCLUSION

For the reasons stated, the Court finds that it has subject matter jurisdiction over the claims contained in plaintiffs' Amended Complaint and that plaintiffs have stated claims for violation of their substantive and procedural due process rights, and for injunctive, declaratory, and mandamus relief. The Court also finds that plaintiffs have failed to state a claim for violation of their equal protection rights, and have failed to establish entitlement to a preliminary injunction.

ACCORDINGLY, it is hereby ORDERED that defendants' Motion To Dismiss is GRANTED with respect to plaintiffs' equal protection claim, but DENIED in all other respects. The Motion For Preliminary Injunction is DENIED.

The Clerk of the Court is directed to send copies of this order to all counsel of record.