Andrzej **KIELCZYNSKI** a/k/a/ **Joseph Barak, Plaintiff,**

v.

THE **UNITED STATES CENTRAL IN- TELLIGENCE AGENCY,** George **Tenet, individually and in the capacity of the Director of the United States Central Intelligence Agency, Defendants.**

No. 00 CV 539.

United States District Court, E.D. New York.

Feb. 20, 2001.

Janusz Andrzejewski, New York City, for Plaintiff.

Sandra L. Levy, United States Attorney, Civil Division, New York City, for Defendants.

## Memorandum & Order

GLASSER, District Judge.

Defendants the United States Central Intelligence Agency ("CIA") and George Tenet ("Tenet") are moving to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed.R.Civ.P. Plaintiff Andrzej Kielczynski a/k/a/ Joseph Barak has cross-moved to add the United States as a defendant and to add a claim for an injunction and/or a stay barring the United States from deporting plaintiff from the United States. For the following reasons, defendants' motion should be granted and plaintiff's cross-motion should be denied.

## Background

The Amended Complaint states that plaintiff was recruited as a spy by the CIA in 1985. (Amended Complaint, ¶ 11)[1] At the time, plaintiff was a citizen and resident of Israel, where he served as a member of several political committees, including the Likud Party Central Committee, the Committee for Security and Foreign Affairs and the Committee for Police and Internal Affairs. (¶ 13) Plaintiff signed a contract with the CIA in October 1985, pursuant to which he was to convey classified information to the CIA concerning Israel in exchange for a monthly salary of approximately $3,000 per month, as well as reimbursement of costs and expenses. In addition, plaintiff was to receive United States citizenship and "all of its benefits," including health care insurance and retirement benefits. (¶ 14) Plaintiff was never given a copy of the contract (¶ 12), and its duration was never specified. (¶ 12)

Plaintiff alleges that he performed all of the services contemplated in the alleged secret contract with the CIA from time of his recruitment until 1991. Plaintiff avers that he provided the CIA with information "classified as of the most important value" concerning the Jonathan Pollard affair, the location of Israel's atomic weapons and Israel's use of aid advanced by the United States. (¶¶ 17, 18) Plaintiff further contends that "due to the highly stressful nature" of his work for the CIA, he developed a serious case of diabetes, which was diagnosed by a physician employed by the CIA for the first time in 1991. (¶ 19) That same year, plaintiff contends that the CIA "fraudulently terminated [its] contract" with him. (¶ 16)

Plaintiff next contends that the CIA, after learning of his serious medical condition, arranged a meeting with plaintiff in New York in which agents who spoke no Polish or Hebrew (the only languages in which plaintiff was fluent) urged plaintiff to sign a document that purportedly acknowledged the transfer of $50,000 to plaintiff for treatment of his diabetes. (¶¶ 20–22) Plaintiff, who was not represented by an attorney at the time, signed the document, but never received a copy of it. (¶ 23) Not long after this meeting, plaintiff was forced to return to his home in Israel because he was tipped off that Israeli security services were about to learn of his espionage activities. (¶ 25) Plaintiff did not remain in the United States, despite the fact that the CIA purportedly had promised him citizenship in this country, but instead returned to his native country of Poland. (¶ 26) From the time of this visit to the United States, plaintiff was not able to return to work due to his medical condition. (¶ 41)

In April 1992, plaintiff submitted a notice of claim to the United States Ambassador in Warsaw, Poland, in which he requested $300,000.00 in compensation for his loss of health and retirement pension payments in the amount of $2,000 per month. (¶ 27) Not having obtained a response from the CIA, plaintiff again approached the embassy in Poland with written notices of claim in May 1992 and in June 1993. (¶¶ 28, 29) In 1995, plaintiff visited the United States on a visa he had previously obtained from the CIA in connection with his espionage activities. (¶ 30) While in the United States, he hired an attorney who attempted to pursue plaintiff's loss of health and retirement pension claims, as well as his contract claims, with the CIA. This attorney managed to arrange a meeting between plaintiff and an unidentified member of the CIA and a later meeting with the Associate General Counsel of the CIA, neither of which produced the results plaintiff desired. (¶¶ 31–34) Plaintiff then hired a new attorney who made a Freedom of Information Act request for documents associated with the CIA's alleged contract with plaintiff and payments made pursuant to that contract. (¶ 35) The CIA denied this request, however, on the grounds that

---

1. All citations containing the "¶" symbol refer to the Amended Complaint.

the information requested would be classified. After the summer of 1995, plaintiff returned to Poland, where he remained until 1998, at which time he and his wife entered the United States and requested political asylum. (¶ 36) Plaintiff was subsequently placed in deportation proceedings, which he has since appealed before the Board of Immigration Appeals. (¶ 43) [2] Sometime after arriving in the United States, plaintiff retained a third attorney who also attempted to contact the CIA on plaintiff's behalf but received no response. (¶ 37) Plaintiff's fourth attorney, who currently represents him, also submitted two notices to the CIA on plaintiff's behalf, but received no response. (¶ 38)

In sum, plaintiff contends that over the past seven years, he has tried to no avail to compel the CIA to adjudicate his claim for compensation. Throughout his extensive efforts, plaintiff acknowledges that the CIA never advised him of its decision concerning his claim and did not advise him about the procedure for filing and appealing claims. (¶ 40)

Plaintiff filed the original complaint in this action on January 7, 2000. Defendants served plaintiff with a Motion to Dismiss the complaint on July 11, 2000 and, instead of opposing that motion, on August 24, 2000, plaintiff filed an Amended Complaint. The relief requested in the Amended Complaint consists of: "(a) a preliminary injunction "requiring the CIA to provide the Plaintiff with financial support on a monthly basis equal to the financial support last supplied to Plaintiff by the CIA during a time when Plaintiff was employed by the CIA[,]" and a permanent injunction providing the same relief until such time as plaintiff is "provided a constitutionally adequate internal CIA hearing on his claim" and until defendants "fulfill their constitutional duty to protect plain-

tiff's personal security, adjust Plaintiff's tort claim and or ... provide for Plaintiff's basic needs"; (b) a declaratory judgment that the CIA "failed to provide a constitutionally adequate process for adjudicating Plaintiff's protected interests"; that it must "provide constitutionally adequate procedures for the conduct of internal confidential administrative proceedings related to adjudication of former spies, agents and/or defectors grievances" which include, at a minimum, written procedures, security clearances, access to certain unclassified information and classified information and persons, an opportunity to appear at a hearing, call and cross-examine witnesses and present evidence, a written decision containing findings of facts and conclusions of law, a right to seek reconsideration of any decision, and an independent and timely review; and that the *Totten* doctrine does "not apply to internal confidential administrative hearings conducted by the CIA; (c) an order of mandamus compelling defendant Tenet to adopt internal CIA regulations and procedures in accordance with any declaratory judgment ordered by this court and conduct a hearing of plaintiff's claims in accordance with those regulations; and, (d) an order compelling payment of $5,000,000 in compensatory and consequential damages" arising from plaintiff's claim under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). (Amended Complaint, 15–20)

Now before the court is defendants' motion to dismiss the Amended Complaint for lack of subject matter jurisdiction under Rule 12(b)(1), Fed.R.Civ.P., and for failure to state a claim upon which relief may be granted under Rule 12(b)(6), Fed.R.Civ.P., as well as plaintiff's cross-motion for leave to amend the Amended Complaint to add the United States as an additional defendant and to add a claim for a preliminary

---

**2.** As of December 19, 2000, the date plaintiff's Memorandum in Opposition was signed, plaintiff was scheduled to appear at the Immigration and Naturalization service for deportation on January 3, 2001. (Pl.'s Mem. in Opp'n, 25) At oral argument, defendants informed the court that the INS had granted a stay on plaintiff's deportation until February 21, 2001 and is currently considering plaintiff's request for an additional stay.

and/or permanent injunction barring the United States from deporting plaintiff and his wife to Israel.

## Discussion

### I. Defendants' Motion to Dismiss Amended Complaint pursuant to Fed.R.Civ.P. 12(b)(1) & Fed.R.Civ.P. 12(b)(6)

Because the present motion is one to dismiss pursuant to Rules 12(b)(1) and (6), Fed.R.Civ.P., this court simply assesses the legal sufficiency of the Amended Complaint. *See LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991). All material facts well pleaded in the Amended Complaint will be accepted as true, and all reasonable inferences will be made in the light most favorable to the plaintiff. *Id.; see also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief will a motion to dismiss be granted. *Yusuf v. Vassar College*, 35 F.3d 709, 713 (2d Cir. 1994) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

#### A. Fed.R.Civ.P. 12(b)(1)

The basis for federal jurisdiction pleaded in the Amended Complaint is 28 U.S.C. §§ 1331, 1346(b), 1361 and 2201. In any suit in which the United States is a defendant, a waiver of sovereign immunity with respect to the claim asserted is a prerequisite to subject matter jurisdiction. *Up State Federal Credit Union v. Walker*, 198 F.3d 372, 374 (2d Cir.1999) (citing *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 139 (2d Cir.1999) (citing *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983))). Accordingly, to establish the jurisdiction of the district court in this case, Kielczynski must establish that the government has waived its immunity to suit court with respect to the claims asserted here. Defendants argue that none of these statutes provide a basis for subject matter jurisdiction, as plaintiff fails to demonstrate that the United States has waived its sovereign immunity, and that even if plaintiff could identify a basis for subject matter jurisdiction, dismissal would be required under the doctrine set forth in *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875). Each of these arguments is considered in turn.

#### 1. Sovereign immunity

■ Neither the mandamus statute, 28 U.S.C. § 1361, nor the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, provide an independent source of federal jurisdiction and, accordingly, plaintiff in this case must demonstrate that an independent source of federal jurisdiction exists. *See Natural Resources Defense Council, Inc. v. Thomas*, 689 F.Supp. 246, 259–60 (S.D.N.Y.1988), *aff'd on other grounds*, 885 F.2d 1067 (2d Cir.1989) (§ 1361 "only provides an additional remedy where jurisdiction already exists."); *Schilling v. Rogers*, 363 U.S. 666, 677, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960) ("Declaratory Judgments Act is not an independent source of federal jurisdiction."). Defendants argue that plaintiff has failed to assert an independent basis for jurisdiction because he does not demonstrate that the United States has waived sovereign immunity. Specifically, defendants contend that: (a) the federal question statute, 28 U.S.C. § 1331, implies no general waiver of sovereign immunity; (b) claims arising in a foreign country, such as plaintiff's, are specifically excepted from jurisdiction under the FTCA; and, (c) the limited waiver of sovereign immunity created by the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491(a), does not apply to plaintiff's claims, which are essentially contract claims that have been refashioned as due process claims.

Plaintiff appears to concede that the federal question statute does not constitute a general waiver of sovereign immunity, but argues that the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, does constitute such a general waiver. More-

over, he contends that the FTCA provides a basis for jurisdiction since plaintiff's contract with the CIA did not arise solely outside of the United States. Finally, plaintiff claims that the restrictions of the Tucker Act do not apply to plaintiff's claims, since those claims are "not in essence contract claims."

### a. General waiver

■ Plaintiff argues that a general waiver of sovereign immunity is created by the APA pursuant to *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), and *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988).[3] The Amended Complaint does not plead federal jurisdiction under the APA, and even if it did, the APA would not provide a general waiver in this case. "While the APA does create a general waiver of sovereign immunity as to equitable claims against government agencies, "nothing in the APA 'confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." ' " *Presidential Gardens Assocs. v. United States*, 175 F.3d 132, 143 (2d Cir.1999) (quoting 5 U.S.C. § 702). Because, for reasons articulated below, the court cannot grant the relief sought here without running afoul of the Tucker Act, 28 U.S.C. §§ 1346 and 1491(a), the APA cannot be construed to create a general waiver of sovereign immunity.

### b. FTCA

■ In a heading entitled "Fifth Count—Tort," the Amended Complaint at-

tempts to delineate a claim for "loss of health, pain and suffering." This claim repleads by reference paragraphs 1 through 52 and alleges that: "*As a result of his employment with the CIA*, the Plaintiff has developed a serious case of diabetes, which have [sic.] irrevocably caused Plaintiff to loose [sic.] his ability to be employed and/or to earn a living." (¶ 54) (emphasis supplied) In addition, it alleges: "The Defendants had a notice of Plaintiff's medical condition on or about the year 1991 and were served additionally with several notices of claim, the first one on or about April 22, 1992 and the last one on June 15, 1999, however, the Defendants failed to adjust the Plaintiff's claim for loss of health, pain and suffering." (¶ 55)

Setting aside for a moment the fact that the court is unable to discern an actual tort from these allegations—as plaintiff does not allege negligence nor any other cognizable intentional tort—this court would lack jurisdiction over a tort claim, were one alleged, if the exception to the FTCA articulated in 28 U.S.C. § 2680(k) applies here. The FTCA provides a limited waiver of the sovereign immunity of the United States for certain torts by providing that the United States shall be liable for such torts "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. However, the United States expressly retains sovereign immunity for "[a]ny claim arising in a foreign country." 28 U.S.C. § 2680(k); *see also Smith v.*

---

3. Neither of these cases support plaintiff's argument that the APA creates a general waiver of sovereign immunity in this case. In *Bowen*, the court found that an action by the State of Massachusetts against the U.S. Secretary of Health and Human Services was not barred by the exception to the APA for actions against federal agencies seeking money damages because the judgment was for specific relief that could result in the payment of money to plaintiff. 487 U.S. at 909–910, 108 S.Ct. 2722. In this case, in contrast, plaintiff alleges that he *is* seeking money damages, albeit through a request for an injunction, in

the form of financial support, as well as $5,000,000 in compensatory and consequential damages through his FTCA claim. Nor is *Webster* apposite. There, the court held that 50 U.S.C.A. § 403(c) permitted the Director of the CIA to make employment decisions in the interest of national security, including the decision to dismiss plaintiff. 486 U.S. at 603, 108 S.Ct. 2047. Defendants here have not invoked § 403(c) as a bar to this action, though they reserve the right to do so if necessary. Moreover, this action does not involve a federal employee challenging an employment decision.

*United States*, 507 U.S. 197, 198–203, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (foreign country exception to FTCA under § 2680(k) precludes action against the United States for claims arising in foreign country).

Defendants here argue that, by any "fair reading," the Amended Complaint alleges that plaintiff's employment with the CIA took place and was to be substantially performed abroad and that the Amended Complaint therefore falls squarely within the so-called foreign country exception set forth in the FTCA. Defendants cite numerous provisions of the Amended Complaint which describe events that occurred in Israel and Poland—including plaintiff's position on various political committees in Israel, plaintiff's departure from Israel when he learned that his spy activities were soon to be discovered by Israel, and plaintiff's subsequent return to Poland—and claim that "taken as a whole" these events compel the conclusion that plaintiff's employment was abroad.

Although, as defendants correctly point out, no explicit nexus is provided in the Amended Complaint between the action which supposedly caused the injury and the United States, plaintiff argues in his memorandum of law that the nexus to the United States is supplied by several trips plaintiff contends he made to the United States "in order to file reports, [and] to undergo training and medical examinations" and that these trips "were as much [sic.] stressful to plaintiff as his duties performed in Israel[.]" (Pl.'s Mem. in Opp'n, 16–17) Having occasionally traveled to the United States on business related to his contract with the CIA, plaintiff avers that his employment did not "occur" solely in a foreign country. Plaintiff further contends that because this is a motion to dismiss, the court must resolve any factual ambiguities in favor of the moving party and cannot conclude, as a matter of law, that plaintiff's claim arose abroad.

Even assuming for purposes of this motion that plaintiff could succeed in proving that his employment took place in the United States, in order to evade the foreign country exception to the FTCA, plaintiff would have had to allege not that his employment took place in this country but that a tortious act or omission on the part of the government occurred in the United States, even though the act or omission had its "operative effect" in a foreign country.[4] *See e.g., Cominotto v. United States,*

---

4. "An FTCA claim is decided under the law of the place in which the negligent act or omission occurred and not the place in which the act or omission had its operative effect. These claims are characterized as 'headquarters claims.'" *Couzado v. United States by & Through DEA of the DOJ,* 105 F.3d 1389, 1395 (11th Cir.1997) (rejecting government's contention that foreign country exception applied because all of the negligent acts took place in South America) (citing *Richards v. United States,* 369 U.S. 1, 10, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962) ("Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred."); *Sami v. United States,* 617 F.2d 755, 762 (D.C.Cir.1979) (same); *Leaf v. United States,* 588 F.2d 733, 735–36 (9th Cir.1978) (§ 2680(k) does not exempt U.S. from liability for negligence in this country which was alleged to have caused airplane damage in Mexico); *Donahue v. United States Dep't of Justice,* 751 F.Supp. 45, 47 (S.D.N.Y. 1990) (finding that plaintiff failed to allege a headquarters claim but noting that "a claim is not barred by section 2680(k) where the tortious conduct occurs in the United States, but the injury is sustained in a foreign country.")); *MacCaskill v. United States,* 834 F.Supp. 14, 16–17 (D.D.C.1993) (holding that a claim "'arises' for purposes of § 2680(k) where the alleged negligent act or omission occurred for purposes of 28 U.S.C. § 1346(b)[,]" which states in relevant part that "the district courts ... have exclusive jurisdiction of civil actions on claims against the United States ... in accordance with the law of the place where the act or omission occurred."); *see also In re "Agent Orange" Product Liability Litigation,* 580 F.Supp. 1242, 1255 (E.D.N.Y.1984), *appeal dismissed,* 745 F.2d 161 (2d Cir.1984) (holding that "although the injuries to the claimants resulting from the exposure to Agent Orange occurred in Vietnam, the initial decision to use Agent Orange, the decision to continue using it, and the decision relating to the specifications for the herbicide, were all made in the United

802 F.2d 1127, 1129–30 (9th Cir.1986) (rejecting plaintiff's "headquarters claim" on the ground that he failed to establish that there was any connection between the allegedly negligent acts in the United States and the injury in Thailand, and that the Secret Service activities within the United States were too far removed to support a headquarters claim, since the planning of the investigation occurred primarily outside of the United States); *Donahue v. United States Dep't of Justice*, 751 F.Supp. 45, 47 (S.D.N.Y.1990) (finding that, even where memorandum of law alleged that conduct leading to his injury emanated from the United States, dismissal under 12(b) would be appropriate where complaint itself failed to allege that plaintiff was injured while acting in furtherance of instructions that he received from DEA officials in the United States, but sustaining complaint in deference to *pro se* plaintiff). Because plaintiff here alleges that the loss of health, pain and suffering he experienced took place "as a result of" the stressful nature of his employment, rather than as a result of the acts or omissions occurring in the United States and because those losses were undoubtedly experienced abroad, where plaintiff was residing both during and after his work for the CIA, he fails to articulate a "headquarters claim" under the FTCA. Nor is the deference articulated in *Donahue* appropriate here, as plaintiff has been represented in connection with this matter not by one but by four separate attorneys.

As such, plaintiff's FTCA claim is not within the waiver of sovereign immunity, and, consequently, jurisdiction is lacking in this court over that claim.[5]

States. Therefore, the negligent act or omission occurred in the United States and liability was properly imposed upon the government.").

5. Defendants have reserved the right to raise other defenses to the FTCA claim including the failure to name the United States as defendant, the failure to exhaust administrative

### c. Tucker Act

Defendants next argue that dismissal is warranted under the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491(a). The Tucker Act creates a limited waiver of federal sovereign immunity to suits alleging a breach of an express or implied contract with the United States by providing, in relevant part, that "district courts shall have original jurisdiction, concurrent with the United States Claims Court, of ... (2) Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded ... upon the Constitution, ... or upon any express or implied contract with the United States." 28 U.S.C. § 1346(a)(2). Thus, the Tucker Act vests the district court with jurisdiction to hear contract claims only against the United States only where the amount in dispute is less than $10,000. See *C.H. Sanders Co., Inc. v. BHAP Housing Dev. Fund Co., Inc.*, 903 F.2d 114, 118 (2d Cir.1990). Breach of contract claims exceeding $10,000 must be filed in the Federal Court of Claims, as that Court has exclusive jurisdiction over such claims. *Id.* at 118. If the claims alleged in the Amended Complaint are deemed contractual in nature, despite the fact that they are labeled as constitutional claims, the Tucker Act applies and precludes this court from exercising jurisdiction, as the claim for money damages is in excess of $10,000. If, on the other hand, the court were to assume that plaintiff is suing under the Constitution, such a suit is also subject to the Tucker Act and jurisdiction in this court would be lacking because the relief sought exceeds $10,000.

Defendants contend that the claims alleged in the Amended Complaint, while refashioned as constitutional claims, have

remedies, failure to state a tort claim and statute of limitations. (Defs.' Mem 13 n. 3) However, in view of the court's finding that jurisdiction is lacking due to the fact that plaintiff's claims arose outside of the United States, it is not necessary to consider those defenses here.

retained their essence as contractual claims and that such claims cannot be maintained under the Tucker Act because the damages requested exceed $10,000. Plaintiff argues, in contrast, that the claims alleged in the Amended Complaint "arise, in fact, from several factors, only one of which is [his alleged] contract" with the CIA; that he is not seeking recovery on the contract or the declaration of any contract rights; and that all plaintiff seeks is to compel "a constitutionally adequate hearing in which to adjudicate his rights under the rule of law." (Pl.'s Mem. 11–13) The fact that his constitutional claims may be based on an entitlement derived from a contractual right does not, plaintiff avers, automatically transform those claims into contract claims.

The Second Circuit, in *Up State Federal Credit Union v. Walker*, 198 F.3d 372, 376 (2d Cir.1999), adopted the analysis set forth by the D.C. Circuit in *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C.Cir.1982) for determining whether an action is "at its essence" a contract action for purposes of the Tucker Act. The D.C. Circuit there was distinguishing between a contract action, which would have been forbidden under the Tucker Act, and a challenge under the APA to a federal agency's action on constitutional and statutory grounds. *Megapulse*, as noted by the Second Circuit, held that the determination of whether an action is " 'at its essence' a contract action [for purposes of sovereign immunity under the Tucker Act] depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought ...." *Up State*, 198 F.3d at 375 (citing *Megapulse*, 672 F.2d at 968; *A & S Council Oil Co. v. Lader*, 312 U.S.App. D.C. 270, 56 F.3d 234, 240 (D.C.Cir.1995) (citing *Megapulse*, 672 F.2d at 959); *Ingersoll–Rand Co. v. United States*, 250 U.S.App. D.C. 412, 780 F.2d 74, 76–77 (D.C.Cir.1985) (same); *Spectrum Leasing Corp. v. United States*, 246 U.S.App. D.C. 258, 764 F.2d 891, 893 (D.C.Cir.1985)); *Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C.Cir.1986) (holding

that Tucker Act did not govern, and jurisdiction was appropriate over appeal of plaintiff who requested equitable relief *only* from United States Air Force Reserves' decision to transfer him, which he alleged was contrary to regulations, statutes and the Constitution, but that jurisdiction was lacking over his claim for declaratory judgment).

Plaintiff in *Megapulse* was a government contractor who sought to enjoin the release of certain technical data it had given to the Coast Guard pursuant to a sale of navigational equipment on the ground that release of such data would deprive the contractor of its property without due process of law and would violate the Trade Secrets Act, 18 U.S.C. § 1905 (1994). *See Megapulse*, 672 F.2d at 961–63. The D.C. Circuit found that jurisdiction was appropriate because the plaintiff had demonstrated that the source of its rights was "ultimately based, not on breach of contract, but on an alleged governmental infringement of property rights and violation of the Trade Secrets Act" and because the remedy sought, an injunction, arose from the Trade Secrets Act and not from the contract between the parties. *Id.* at 969, 971.

*Up State* involved a plaintiff who sought to require the United States Army to execute a facility lease. Plaintiff attempted to characterize its action as an APA challenge rather than a contract dispute by arguing that an Army Regulation granted it a noncontractual right to enter into a facility lease. Applying the analysis set forth in *Megapulse*, the *Up State* court concluded that: (i) plaintiff could not avoid the strictures of the Tucker Act by labeling his action an APA challenge rather than a contract dispute and (ii) since adjudication of the dispute required an interpretation of the expired land lease, "the source of the right at issue [was] the contract between the parties rather than Army Regulation." *Id.* at 397. In so concluding, the court made the following observations:

Unlike the plaintiff's proprietary rights in *Megapulse,* the Credit Union's right in this case stems from no independent, non-contractual source. *See Megapulse,* 672 F.2d at 969. Whereas the plaintiff's rights in *Megapulse* were grounded in the Trade Secrets Act and would have existed in the absence of a contract, the right that the Credit Union seeks to vindicate is not "ultimately based" on anything other than the lease with the Army. *See id.; cf. Manshul Construction,* 687 F.Supp. [60] at 62 [(E.D.N.Y. 1988)] (holding that even though plaintiff's "right" to seek recission of a contract may have been protected by statute, the right was "meaningless in the absence of a contract"); *Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 54–55 (2d Cir.1985) (holding that there was no implied cause of action under the Federal Housing Act that could provide plaintiff with a non-contractual waiver of sovereign immunity). Had the parties not entered into the agreement at issue in this case, the Credit Union could have had no possible right to transfer title in the building to the Army, or to demand that the Army grant it a facility lease for that building. In the absence of a contract with the Army, therefore, "it is likely that no cause of action would exist at all." *Id.* at 55.

In his original Complaint, plaintiff here sought compensatory and consequential damages for breach of an alleged employment contract with the CIA. (Defs.' Mem Ex. A) In the Amended Complaint, plaintiff recasts the same facts into a due process claim. Plaintiff argues that "[p]ursuant to the contract with the CIA," he was to convey to the CIA classified and otherwise sensitive information in exchange for a monthly salary and reimbursement of costs and expenses, as well as United States citizenship, health care insurance and retirement benefits. (¶¶ 14, 15) Moreover, plaintiff contends that despite his compliance "with the terms and conditions of his employment contract," in 1991 the CIA "fraudulently terminated the contract[.]" (¶ 16) Finally, plaintiff alleges that he sought enforcement of the alleged employment contract when, in 1992, he approached the United States Ambassador in Warsaw, Poland with a notice requesting a retirement pension of $2,000 per month. (¶ 27)

The Amended Complaint seeks injunctive relief in the form of an order compelling defendants to continue paying plaintiff compensation at the rate provided in the alleged contract, but also seeks a declaratory judgment which provides that, before it may terminate an individual with whom it has contracted to serve as a spy, the CIA must conduct a hearing in which certain procedural protections are provided, and that the failure to provide such a hearing infringes on a liberty and property interest protected by the due process clause. In addition, the Amended Complaint seeks an order of mandamus compelling defendant Tenet to adopt regulations which put into effect such procedural protections and to make available those protections to plaintiff. Finally, the Amended Complaint seeks additional monetary relief in the amount of $5,000,000.

Kielczynski argues that the source of the rights and remedies at issue here is the due process clause, not the alleged contract with the CIA. However, like the plaintiff in *Up State* and unlike the plaintiff in *Megapulse,* plaintiff's rights would not have existed in the absence of a contract. Had the parties never entered into the alleged contract in this case, Kielczynski would "have no possible right" to seek a hearing adjudicating the rights to compensation and protection from the harm purportedly created by that contract. Therefore, the rights he seeks to enforce through this action are not "ultimately based" on anything other than the alleged contract with the CIA. Although plaintiff correctly notes that the *Megapulse* court acknowledged that a claim grounded in the due process clause may exist apart from a

contractual claim, plaintiff's due process claim in that case arose from the deprivation of rights that were not created by the contract between the parties but by the government's threatened release of technical data in violation of the Trade Secrets Act. In other words, even if the parties in *Megapulse* had never formed a contract, the action contemplated by the government—the release of certain technical data it had purchased from plaintiff—itself threatened to deprive plaintiff of a due process right. Here, in contrast, the only way to find that the action taken by the CIA—namely its termination of Kielczynski's contract without a hearing and its denial of monetary compensation or protection—violates some due process right would be to find that a contract existed. Thus, this is not simply a case in which the court "may have to rule on a contract issue [which would] by triggering some mystical metamorphosis, automatically transform [the action] into one on the contract and deprive the court of jurisdiction it might otherwise have" *Megapulse*, 672 F.2d at 968. This is a case in which the very existence of the alleged due process claim hinges on the existence of a contract. For that reason, the court finds that conclusion reached in *Up State* is apposite and that there is no basis for jurisdiction over plaintiff's due process claims in this court.

In addition to *Megapulse* and the line of cases that follow it, plaintiff purports to derive support for his argument that Tucker is inapplicable from *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and *John Doe v. George J. Tenet*, 99 F.Supp.2d 1284 (W.D.Wash.2000). Plaintiff in *Perry* was a teacher who argued that his due process interest in continued employment at a particular junior college "though not secured by a formal contractual tenure provision, was secured by a no less binding understanding fostered by the college administration." *Id.* at 600, 92 S.Ct. 2694. In recognizing that plaintiff could state a due process interest in not being transferred, the Court held that: "A written contract

with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient 'cause' is shown." *Id.* at 601, 92 S.Ct. 2694. Not before the court, however, was the question of whether a plaintiff can bring a constitutional claim that arises from a contract where a contractual claim would be explicitly prohibited by the Tucker Act. Because that is the question posed by this case, its resolution must be found elsewhere, namely in the *Up State* case.

As for the *John Doe* case, the holding of the court there—that a due process violation may be found to exist where the factual allegations arise from a secret contract with the CIA even if jurisdiction would not lie for a claim based in contract on those same facts—is not resonant with the reasoning articulated by the Second Circuit in *Up State*. Plaintiffs in *John Doe* were a husband and wife who had purportedly conducted espionage for the United States in their foreign country of origin and who challenged the CIA's decision to cease paying them a stipend and its treatment of their administrative appeal. Plaintiffs in *John Doe* had received a yearly stipend of as much as $27,000, in addition to housing, health care and other benefits. 99 F.Supp.2d at 1287. The CIA had phased out the stipend when Mr. Doe, with the CIA's assistance, obtained professional employment. When Mr. Doe was laid off after a corporate merger, the CIA refused to assist him in obtaining a new job and declined to reinstate the stipend. Plaintiffs contacted the CIA but were informed that they had already received adequate compensation and that their only recourse was to appeal the decision to the agency director. Had the Second Circuit in *Up State* been faced with the same facts that were before the district court in *John Doe*, it is this court's belief that the Second Circuit would conclude that jurisdiction was lacking because plaintiffs could not point to a due process right arising from anything other than the alleged contract.

For the reasons already articulated, this court is not persuaded that the due process claims alleged by Kielczynski are independent of the alleged contract and, accordingly, declines to adopt the holding of *John Doe*. The court declines to adopt the holding of *John Doe* for the additional reason that it fatally collides with *Totten*.

## 2. *Totten* Doctrine

Defendants next argue that even if the Amended Complaint pleaded a basis for federal jurisdiction, it would have to be dismissed pursuant to *Totten v. United States*, 92 U.S. 105, 23 L.Ed. 605 (1875). *Totten* held that the secrecy required by secret informant agreements "preclude[s] any action for their enforcement." 92 U.S. at 107. "Public policy," noted the Court, "forbids the maintenance of any suit[,] the trial of which would inevitably lead to the disclosure of matters which the law itself regards as confidential, and respecting which it will not allow the confidence to be violated." *Id.* In explaining the rationale for such a broad exclusion, the Court noted:

> The service stipulated by the contract was a secret service; the information sought was to be obtained clandestinely, and was to be communicated privately; the employment and the service were to be equally concealed. Both employer and agent must have understood that the lips of the other were to be for ever sealed respecting the relation of either to the matter. This condition of the engagement was implied from the nature of the employment, and is implied in all secret employments of the government in time of war, or upon matters affecting our foreign relations, where a disclosure of the service might compromise or embarrass our government in its public duties.

*Id.* at 106.

*Totten* has been widely applied by the Federal Court of Claims in the context of secret contracts for espionage and other intelligence services to dismiss claims brought by plaintiffs alleging that they performed secret espionage services in foreign countries for the United States. *See, e.g., Korczak v. United States*, No. 96–5139, 124 F.3d 227, 1997 WL 488751 (Fed. Cir.1997) (unpublished opinion) (dismissing under *Totten* claim of plaintiff who allegedly served as CIA agent); *Guong v. United States*, 860 F.2d 1063, 1065 (Fed.Cir.1988) ("[I]t cannot be doubted that Totten stands for the proposition that no action can be brought to enforce an alleged contract with the government when, at the time of its creation, the contract was secret or covert."); *Mackowski v. United States*, No. 605–80C, 228 Ct.Cl. 717, 1981 WL 21464 (June 12, 1981) (dismissing claim of plaintiff who performed espionage activities in Cuba where the CIA had failed to pay her expenses and other benefits as promised and where the government did not waive the *Totten* defense simply because plaintiff was released from a Cuban prison due to the efforts of a United States Senator); *Simrick v. United States*, No. 45–80C, 650 F.2d 288, 1980 WL 99699 (Ct. Cl. June 17, 1980) (unpublished opinion) (dismissing claim of plaintiff who performed espionage services in Poland); *Tucker v. United States*, 127 Ct.Cl. 477, 118 F.Supp. 371 (1954) (dismissing claim of plaintiff who performed intelligence services in Mauritius during World War II); *Allen v. United States*, No. Cong. 3925, 27 Ct.Cl. 89, 1800 WL 1840 (Jan. 4, 1892) (dismissing claim of plaintiff who performed espionage services during Civil War); *DeArnaud v. United States*, 26 Ct. Cl. 370, No. 16442, 1800 WL 1795 (June 8, 1891) (same).

Like plaintiffs in these cases, plaintiff here alleges that he entered into a secret contract with the CIA pursuant to which he was to provide the CIA with "classified and otherwise sensitive information" and that he performed such services from 1985 to 1991. In exchange for such services, plaintiff contends that he was guaranteed a monthly compensation, United States citizenship, and health and retirement bene-

fits. Despite the fact that the rights asserted in this action stem directly from the CIA's termination of its alleged contract with plaintiff, plaintiff argues that the restriction imposed by *Totten* on "any suit" which would require disclosure of the terms of a secret contract on does not apply here by virtue of the fact that the claims asserted here are rooted in the Constitution.

The only authority plaintiff cites for his claim that the *Totten* doctrine does not apply to bar his action is the *John Doe* case from the Western District of Washington, which, for reasons stated previously, this court declines to follow. The court in *John Doe* distinguished the *Guong* case on the ground that plaintiffs in that case had no constitutional claims but were simply suing to recover for breach of alleged employment contracts with the CIA, "a purely contractual claim." *John Doe*, 99 F.Supp.2d at 1290. However, in view of this court's earlier finding that jurisdiction is lacking under the Tucker Act over plaintiff's due process claim because such a claim cannot arise independent of plaintiff's contractual claims, the *John Doe* court's distinction of *Guong* and similar cases is inapposite.

Even assuming, as the court did in *John Doe*, that a constitutional claim advanced by a plaintiff challenging the CIA's procedures for reviewing complaints and appeals may raise factual questions "outside the scope of a *Totten*-type contract dispute[,]" *id.* at 1290, the basis for *John Doe* court's conclusion that the constitutional claim was not shielded by *Totten* was arguably far stronger than in this case. Crucial to the court's finding there that an independent constitutional claim existed was the CIA's representation to plaintiffs that they were entitled to certain procedural rights. "[R]egardless of whether plaintiffs had a contractual entitlement to benefits (which *Totten* might foreclose the Court from recognizing) or a right to benefits arising out of promissory estoppel, equitable estoppel, or a statutory or regulatory right, *once the defendants represented to plaintiffs that a process existed* through which they could 'appeal' the denial of their monetary stipend, defendants assumed an obligation to provide procedural due process to plaintiffs." *Id.* at 1289–90 (emphasis supplied).

Here, in contrast, *Kielczynski* has not alleged that the CIA ever represented to him that such a process existed. In fact, from the date in 1991 he claims to have been paid $50,000 for treatment of his diabetes, plaintiff acknowledges that he was rebuffed at every turn during his prolonged attempt to compel the CIA to provide him with the protection and compensation it had allegedly guaranteed. "At no time," he alleges, "was the Plaintiff nor [sic.] any of his attorneys advised about the CIA's procedure for filing claims nor for appealing claims which the CIA rejected or which the CIA even failed to address and/or to adjudicate." (¶ 40; Pl.'s Mem. in Opp'n, 5).

Plaintiff also has argued that because adjudication of his due process claim would not require the revelation of any information which would compromise national security, *Totten* is inapplicable. In fact, plaintiff has not proceeded as a Doe defendant and his submissions to date (which the CIA has not moved to seal) have revealed many details concerning his alleged work for the CIA. The fact remains, however, the availability of the *Totten* doctrine is not affected by a plaintiff's allegation that adjudication of his claims would not force the United States to reveal additional information that might compromise national security.

In *Guong*, the court considered plaintiff's argument that his cause of action fell outside the *Totten* prohibition because the covert military operations in which he was apparently engaged had already been publicly revealed in books and memoirs published by former CIA and military officials and, accordingly, their revelation in plaintiff's action would not compromise national security. 860 F.2d at 1065–66. In rejecting this argument, the court there noted that "neither publications nor the passage

of time obviate the Government's need to protect secret [or covert] information and what may seem historical trivia to [the plaintiff] may be of great moment to the government, which had a much broader view of the world scene." *Id.* at 1066. Similarly, in *Mackowski,* the court rejected plaintiff's argument that the government had waived a defense under *Totten* because plaintiff had been released from a Cuban prison due to the efforts of then Senator Frank Church. 228 Ct.Cl. at 717. "[S]uch action[,]" noted the court, "cannot be construed as a public confirmation or publication that plaintiff performed espionage services for the United States." *Id.* (citing *United States v. Marchetti,* 466 F.2d 1309, 1318 (4th Cir.1972), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516) (rumor and speculation are not the equivalent of public disclosure; and the presence of that kind of surmise is no reason for avoidance of constraints on publication).

For the reasons persuasively articulated in *Guong* and *Mackowski,* plaintiff's argument that *Totten* is inapplicable here because it would not force the United States to reveal any sensitive information cannot be sustained. The decision of whether information that must be revealed is sensitive, including even an admission or denial of the existence of a secret espionage contract, is reserved under *Totten* to the United States.

In arguing that jurisdiction is proper over this action despite the *Totten* doctrine, plaintiff perhaps makes a more persuasive argument for why the doctrine is unfair or outdated than for why it does not apply here. The allegations in the Amended Complaint, if true, indeed paint a disturbing picture of the CIA and its treatment of former spies. Namely, plaintiff alleges that:

> The CIA regularly makes promises to and agreements with spies, agents and/or defectors, and others who rely on such promises and agreements, ignoring its obligations whenever it chooses to do so. To facilitate this wrongful conduct, the Agency utilizes the so-called Totten Doctrine ... to block judicial enforcement of its lawful obligations. In many instances, including this one, the application of the Totten Doctrine is inappropriate and not necessary to protect national security and intelligence sources and methods. The availability of the Totten Doctrine, however, causes the CIA to believe not just that it is beyond judicial scrutiny, but that it need [sic.] to provide only those internal procedures that suit its purposes. The existence of the Totten Doctrine makes full and fair administrative procedures within the CIA all the more essential. If a claimant whose liberty or property interest is subject to CIA actions has no judicial recourse and must avail himself of administrative procedures conducted in secret, than [sic.] those procedures must be [sic.] rigorously fair as possible.

(¶ 9) As sympathetic as the court may be for this class of persons to which plaintiff alludes in the Amended Complaint who, as a result of *Totten,* are left with no way of enforcing the CIA's purported guarantees of financial and personal security, the fact remains that *Totten* is binding law. Adjudication of the due process rights that are claimed here is impossible where those rights are alleged to emerge directly from a contract, the consideration of which is foreclosed by law. As the court in *Korczak* poignantly stated: "However well or ill-founded appellant's arguments may be, this is not the appropriate forum for deciding them. *Totten,* despite its age, is the last pronouncement on this issue by the Supreme Court." 1997 WL 488751, *2. Until the Supreme Court revisits *Totten* or, alternatively, until Congress provides persons in plaintiff's position with some form of recourse, *Totten*'s requirement that "the existence of the contract is itself a fact not to be disclosed[,]" *Guong,* 860 F.2d at 1065 (citing *Totten,* 92 U.S. at 107), cannot be disregarded in the manner urged by plaintiff.

**B. Fed.R.Civ.P. 12(b)(6)**

Defendants in this action argue that even if jurisdiction is proper in this court,

plaintiff's claims should be dismissed for failure to state a cause of action upon which relief may be granted. Defendants first argue that plaintiff's due process claim should be dismissed because plaintiff fails to demonstrate that he has a property or liberty interest protected by the due process clause in that the only possible source of such an interest would be his secret contract with the CIA, consideration of which would run afoul of both the Tucker Act and the *Totten* doctrine. Even if the court were to review the merits of plaintiff's due process claim, defendants contend that plaintiff's purported property interest in the compensation alleged to be owed him does not rise to the level of a constitutionally protected interest under familiar Fourteenth Amendment precedent. Likewise, defendants argue, plaintiff's purported liberty interest in personal security does not rise to the level of a constitutionally protected interest since plaintiff can neither allege a "special relationship" with the CIA which would have given rise to a duty to protect, *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 199–200, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), or that the government "assisted in creating or increasing" the danger to which plaintiff is allegedly exposed. *See Dwares v. City of New York*, 985 F.2d 94, 98–99 (2d Cir. 1993). In addition, defendants aver that plaintiff's claims against defendant Tenet should be dismissed for failure to state a claim of relief since plaintiff cannot show, as he must in order to maintain a *Bivens* action for damages against a federal official for violation of a constitutional right, *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), "violation of a clearly established constitutional right," *see Siegert v. Gilley*, 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), and since plaintiff cannot show that Tenet had "personal involvement" in the alleged constitutional deprivation. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (holding

that "personal involvement" of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983); *Butz v. Economou*, 438 U.S. 478, 478–79, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (analogizing § 1983 to *Bivens* claims). Defendants next argue that plaintiff cannot maintain an action in mandamus since he fails to make the requisite showing of "a clear right ... to the relief sought[.]." *See, e.g., Billiteri v. United States Bd. of Parole*, 541 F.2d 938, 946 (2d Cir.1976). Finally, defendants contend that plaintiff's claims are time-barred both by the Tucker Act, 28 U.S.C. 2401(a), which provides a six year statute of limitations, and by New York law, which provides a three-year statute of limitations from the time the claim accrued. *See Tapia–Ortiz v. John Doe*, 171 F.3d 150, 151 (2d Cir.1999). Although plaintiff in his Memorandum in Opposition appears to concede that he cannot maintain a claim against George Tenet, in his individual capacity and that mandamus relief is unavailable, plaintiff argues that he has stated a due process claim upon which relief may be granted because he has a legitimate claim of entitlement to financial support and security from the CIA. Plaintiff also maintains that his claims are not time-barred under either the Tucker Act or New York law, despite his failure to commence an action in court, because he was never formally advised by the CIA that it had denied his claim and the statute of limitations was never triggered.

Because the court finds that jurisdiction is lacking over plaintiff's claims, a holding with respect to whether those claims state a cause of action would be superfluous.

## II. Plaintiff's Cross–Motion for Leave to Amend the Complaint to Add the United States as an Additional Defendant and to Add a Claim for a Preliminary and/or Permanent Injunction barring the United States from Deporting Plaintiff and his Wife

Plaintiff has cross-moved to join the United States as an additional defendant

in this action on the theory that the United States is an indispensable party and to add a claim for injunctive relief barring his and his wife's deportation to Israel. The joinder of the United States as a party would in no way alter the conclusion reached above that subject matter jurisdiction over plaintiff's due process claim is lacking, and therefore would be futile under Federal Rule of Civil Procedure 15(b). *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend."). Because jurisdiction is lacking over plaintiff's claim, there is no basis upon which to conclude that plaintiff's deportation without an internal hearing before the CIA in accordance with the procedures he desires would irreparably harm plaintiff or that plaintiff has a likelihood of success on the merits of his claim. *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979).

### Conclusion

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is granted pursuant to Rule 12(b)(1), Fed. R.Civ.P., and plaintiff's cross-motion for leave to file a Second Amended Complaint to join the United States as an additional defendant and to add a claim for injunctive relief barring his deportation is denied.

SO ORDERED.